Hoile vs. Bailey, imp.    Hoile vs. McCulloch, imp.

# HOILE vs. BAILEY, imp.

# HOILE vs. McCULLOCH, imp.

*October 8 — November 20, 1883.*

EQUITY: MORTGAGES: FORECLOSURE OF LAND CONTRACT. *(1, 2) Transfer in any form as security for debt, a mortgage. (4) Liability of vendee for use, etc., on strict foreclosure of land contract: (5, 6) of mortgagee or trustee in possession.*

STATUTE OF FRAUDS. *(3) Promise to pay debt of another.*

1. Whenever property is transferred, no matter in what form or by what conveyance, as the mere security for a debt, the transferee takes merely as a mortgagee, and has no other rights or remedies.

2. So, where, by agreement between the parties to a contract for the sale of land, after default in payments thereon, an absolute decree of foreclosure was entered in favor of the vendor, and he thereupon conveyed the land to a third person, who advanced the amount unpaid on the contract and accepted the conveyance for the use and benefit of the original vendees, it is *held* that such third person was a mere mortgagee of such vendees.

3. Where B. purchased property of A. on credit, and thereupon sold the same to C., who, in consideration therefor and as a part of the purchase price, promised to pay B.'s debt to A. upon the former purchase, such promise on the part of C. is nothing more nor less than an agreement to pay his own debt, although the incidental effect of such payment would be to discharge B.'s debt to A. Such promise, therefore, is not within the statute of frauds, and, though not in writing, may be enforced by A.

4. Where by the terms of a contract for the sale of land the vendees were to have possession of the land, and the use of a mill thereon, and the right to cut timber up to a certain limit, they are not liable in damages, upon a strict foreclosure of the contract, for the use of the mill or for the timber cut according to the contract, but are so liable for all timber cut in excess of the contract except so far as the proceeds of such timber have been paid upon the contract. *Northrup v. Trask,* 39 Wis., 515, distinguished.

5. But a mortgagee of such vendees is not liable for any waste committed by them prior to the time when he himself took possession under the mortgage, although before that time, having the legal title, he had executed a lease to one of such vendees, such lease having never been acted upon in any way.

6. Trustees in possession are in general chargeable with actual receipts only, except upon proof of gross negligence or of fraud in lessening or concealing receipts; and a mere attempt by them to ignore the trust and deal with the property as their own, is not such a fraud as will charge them beyond actual receipts.

APPEALS from the Circuit Court for *Portage* County.

The case is thus stated by Mr. Justice CASSODAY:

"On November 22, 1875, Ebenezer Whitney, being the owner of several hundred acres of pine-timbered land in Marathon county, agreed in writing to sell and convey the same to his brother, George Whitney, and the plaintiff *Hoile*, then residing in Dixon, Illinois, for $11,000; and thereupon gave to them a bond for a deed, and they paid to him $3,000 of the purchase price within six months thereafter. George Whitney and *Hoile*, as partners, went into the logging business and cut considerable timber from the land. After that partnership had continued about a year a controversy arose between them, and *Hoile* brought suit, in the circuit court of the United States, for a dissolution of the firm, a receiver, etc., but in September, 1877, agreed upon terms of a settlement, which was finally consummated in March, 1878, whereby *Hoile* took the land and assumed and agreed to pay the balance of the purchase price to Ebenezer Whitney. By the terms of the settlement *Hoile* was also to have a certain portion of the personal property, and was to pay George Whitney or Mason as receiver for his benefit $6,000 and interest at ten per cent., of which $3,000 and interest was to be paid June 1, 1878, and $3,000 and interest was to be paid June 1, 1879. Such payments were secured by *Hoile* and the defendant Bratt, who had become a partner with him, giving a note and mortgage upon the land.

"Some time prior to February 8, 1879, and while *Hoile* was in possession of the land as owner, he and the defendant Bratt became partners in the lumbering business and carried on the same in the name of Hoile & Bratt. Upon the forma-

tion of such partnership, *Hoile's* equitable title to the land was put into the partnership as partnership property, the firm taking possession thereof, and in consideration thereof Bratt agreed to, and did, become jointly liable with *Hoile* for the payment of the unpaid purchase price to Ebenezer Whitney, and thereupon the said firm of Hoile & Bratt built and constructed mills and buildings upon the land, and cut a portion of the pine timber from the land, and manufactured the same into lumber. On February 8, 1879, the firm of Hoile & Bratt dissolved, the plaintiff retiring therefrom, and upon such dissolution it was agreed between them that *Hoile* would convey to Bratt the land, but only upon condition that Bratt would pay and discharge all the outstanding indebtedness of the firm, except a claim in favor of one Messenger and a claim in favor of one Martin; and would also pay the balance due to Ebenezer Whitney on the purchase of the land; and also pay the George Whitney or Mason note and mortgage, and pay all other outstanding claims upon or against the lands; and also pay the plaintiff, as a part of the purchase price, $9,000, with interest at ten per cent. payable annually after the first year, of which $4,000 was to become due and payable February 8, 1881, and the balance February 8, 1882; and also pay the plaintiff $1,200, in twelve equal monthly payments, the first to be made March 8, 1880; and also pay a note and mortgage for $1,500 given to Hoyt. As a part of such consideration, Bratt at the same time gave *Hoile* his note for $1,000 due one day after date. By the terms of the said agreement, Bratt was to have and take immediate possession of the lands, and all the personal property belonging to the firm, and to have the right to cut the timber on the lands and manufacture the same into lumber in the usual course of said business; *provided*, that there should at all times be left standing on said lands sufficient good pine timber, the stumpage of which at $1.50 per thousand feet should be sufficient in quantity to cover and

AUGUST TERM, 1883. 437

Hoile vs. Bailey, imp.    Hoile vs. McCulloch, imp.

include all the indebtedness and liability owing or assumed by Bratt as above stated. On February 8, 1879, in pursuance of such agreement, Bratt entered upon and took possession of the lands and property of the firm, and thereafter used and occupied the same in the business, and as the successor of the firm of Hoile & Bratt.

"On or about April 9, 1879, the defendants *Bailey* and Bratt entered into a copartnership for the purpose of carrying on a general logging and lumbering business on said premises under the firm name of Bailey & Bratt. The agreement by which such partnership was constituted was not in writing, but rested wholly in parol. By the terms of said parol contract, the said *Bailey* put into the partnership business, as a part of the capital stock thereof, a large amount of lumber and personal property; and the said Bratt put into the same, as a part of the capital stock thereof, the said timbered lands, mills, and personal property which he then had and which had formerly belonged to the firm of Hoile & Bratt, together with the proceeds of the same which he had received or realized after February 8, 1879. Of the property real and personal so put into said copartnership by said *Bailey* and Bratt, respectively, each was to have and own an equal undivided one-half, subject, however, to the payment, by the new firm of Bailey & Bratt, of all the debts, claims, and liabilities which the said Bratt had assumed and agreed with the said *Hoile* to pay, on his dissolution with *Hoile* as aforesaid, and which debts, claims, and liabilities, the said *Bailey*, as a member of said new firm, together with said Bratt, agreed by parol to assume as debts, claims, and liabilities of the said firm of Bailey & Bratt, to be paid by said partners from said partnership property and business. Such agreement was to date back and take effect as of February 8, 1879, and all rights, claims, and liabilities were to be adjusted as of that date.

"Immediately upon the formation of the copartnership

of Bailey & Bratt, the new firm entered upon and took possession of all the lands, mills, and personal property so put into said partnership by said *Bailey* and Bratt respectively, and held and used the same in common in their said partnership business, and (except as hereinafter stated) continued to cut down large quantities of timber on said lands, and manufactured the same into lumber and shingles in said mills, and sold and disposed of the same as such partnership property, and, out of the proceeds thereof, paid a large amount of money in reducing the claims so assumed by Bratt on his dissolution with *Hoile*, including the amount due on the contract or judgment held by Ebenezer Whitney and the Mason mortgage. *Bailey* entered into said partnership and agreement with full knowledge of the said agreement between *Hoile* and Bratt, and of the rights of the plaintiff therein, and of all the liabilities of Bratt therein.

"Bailey & Bratt, and each of them, failed and neglected to pay, and the plaintiff was compelled to and did pay, the following debts of Hoile & Bratt, and which had been so assumed by Bratt and Bailey & Bratt, to wit: To Hoyt (Messenger claim), $1,680; to Dixon National Bank, $560; to M. Hoile, $540; and to I. Brill, $180.    Bailey & Bratt also failed and neglected to pay any portion of the Mason note and mortgage, except $1,335.58 paid by them May 10, 1879, and there was still due thereon on July 6, 1882, the sum of $4,107.16.    This sum was a lien upon said lands prior to the lien of the plaintiff, but subsequent to the lien of Ebenezer Whitney as aforesaid.

"On February 8, 1879, an action was pending in the circuit court for Marathon county for the strict foreclosure of the said contract held by Ebenezer Whitney, and on April 14, 1879, judgment was entered therein to the effect that there was then due thereon $5,355.32, and that unless one half thereof should be paid on or before July 15, 1879, and the other half on or before October 15, 1879, the defendants

therein should be foreclosed and barred of all right or claim to, or interest in, said premises. Bailey & Bratt did pay the one-half thereof on or before July 15, 1879, and, on or about October 15, 1879, the remainder of said judgment being unpaid and the said Ebenezer Whitney being about to enter an absolute decree of foreclosure therein, the said *Bailey*, in behalf of Bailey & Bratt, applied to *McCulloch* for assistance, and informed him that their success depended upon his getting the land, and enabling them to cut the timber, and thereupon it was agreed by and between Whitney and *Bailey*, in behalf of Bailey & Bratt, that the amount then remaining unpaid on the judgment should not then be paid, but an absolute decree should be then entered therein, and the title thereby be vested in Ebenezer Whitney, and by him thereafter to be transferred to the defendant *McCulloch*, or some other person to be named by *Bailey;* and that Bailey & Bratt, through *McCulloch* or the person named, would pay or cause to be paid to the said Ebenezer Whitney the amount then remaining due and unpaid on the judgment.

" Thereupon and in pursuance of that agreement, an absolute decree was entered in said action, October 17, 1879, and on October 23, 1879, the said Ebenezer Whitney conveyed the legal title to all the premises covered by said decree to the said *McCulloch*, who thereupon paid to the said Ebenezer Whitney $2,000, by giving him credit for that amount in his bank, and became responsible to said Whitney for the balance, his due on said judgment, to wit, the sum of about $900, which he paid May 24, 1880. *McCulloch* accepted such title with full knowledge of the agreement between Ebenezer Whitney and Bailey & Bratt, and with the full understanding and agreement with them, respectively, that he would only hold the same as security for the money so advanced and to be advanced by him, and that upon being fully reimbursed, he would convey the same to the said Bailey & Bratt, for whose benefit he had taken the title.

Bailey & Bratt did subsequently reimburse and pay over to the said *McCulloch* the $2,000 so advanced by him, and interest, out of the proceeds of said partnership property, but neglected and failed to pay over to him the $900 paid to Whitney as aforesaid.

"At the time of the agreement between *Bailey*, Whitney, and *McCulloch*, and of the deed from Whitney to *McCulloch*, there was an action pending, in favor of the said *Hoile* and against the said Bailey & Bratt and one Sprague, for the purpose of reaching moneys coming to Bailey & Bratt as such partners from said Sprague for lumber they had sold him, and to enjoin the said Bailey & Bratt from cutting timber on said premises. On October 30, 1879, *McCulloch*, at the request of *Bailey*, and in the presence of James O. Raymond, executed a lease, wherein and whereby he authorized and empowered *Bailey* to enter upon and take possession of said lands, together with the saw-mill, shingle-mill, dwelling-houses, and all other buildings and machinery appurtenant to said premises, and to cut from said lands and manufacture into lumber and shingles at said mills the pine and other timber growing and being upon the lands, and to sell and dispose of said lumber and shingles; in consideration of which *Bailey* agreed to keep the mill, machinery and buildings in good repair, and pay *McCulloch* for the use of the premises and timber so cut, $2 per thousand feet, to be scaled and estimated in the log, and for the use of the mill in manufacturing timber cut from other lands, $1 per thousand feet. It was further provided in said lease that *Bailey* should pay all taxes on the premises during the contract, and should keep a just and true account of all logs scaled, and at the end of every three months should account and pay to *McCulloch* therefor the sums so specified; and that the contract should continue for three years from date unless sooner terminated by the parties thereto. This lease so executed was left and remained with the said Raymond.

"On October 30, 1879, the amount of good pine timber on the lands in question did not exceed 4,000,000 feet. Between February 8, 1879, and October 30, 1879, Bailey & Bratt cut from the land 1,750,000 feet of pine, worth $1.65 per thousand feet, board measure; and during the same period there was sawed in the mill by Bailey & Bratt 1,865,000 feet of lumber and timber, and 2,000,000 shingles; and the value of the use of the mills and premises to manufacture the lumber and timber was eighty-five cents per thousand feet, board measure, and fifteen cents per thousand for the shingles. Between October 30, 1879, and April 1, 1880, Bailey & Bratt, as partners as aforesaid, continued to cut timber from the land and manufacture the same into lumber and shingles, and to sell and dispose of the same, and use the proceeds thereof as their own, the same in all respects as they had done prior to the deed from Whitney to *McCulloch;* and during that period no account was kept by *Bailey*, Bratt, and *McCulloch*, or any of them, of the amount of lumber or shingles manufactured, nor of the cost of such manufacture, nor of the costs of repairs, nor of the earnings of the mill. Between October 30, 1879, and April 1, 1880, Bailey & Bratt, as such partners, cut and removed from the lands 2,250,000 feet of pine timber, board measure, and manufactured the same into lumber and shingles in said mills, and sold the same. The value of the timber was $1.65 per thousand feet, board measure, and of the use of the mill to manufacture lumber eighty-five cents per thousand feet, board measure, and to manufacture shingles fifteen cents per thousand. Of the pine timber so cut and removed from that land during that period by Bailey & Bratt there was sawed into lumber and timber 1,850,000 feet, and 2,000,000 shingles were manufactured; and the value of the use of the mill in manufacturing the lumber and shingles was the same as above stated.

"During the time from April 9, 1879, until April 1, 1880,

the said Bailey & Bratt, as such copartners, deposited from time to time in said *McCulloch's* bank, so called, moneys received by them in their business, and checked it out from time to time as business men usually do.

"On April 1, 1880, Bailey & Bratt being unable to continue the business, *McCulloch* took exclusive possession of the mill and continued to hold the same, and between April 1, 1880, and April 1, 1881, manufactured in the mill 3,230,215 feet of lumber, board measure, and 1,500,000 shingles. The value of the use of the mill, machinery and premises for those purposes was eighty-five cents per thousand for the lumber, and fifteen cents per thousand for the shingles, making a total of $2,970.68; but none of the logs or timber from which said *McCulloch* so manufactured the same was ever cut or taken from the lands in question. An account of the amount of lumber and shingles so manufactured in the mill by *McCulloch* was kept; and also a separate account of the cost of such manufacture; and also an itemized account of the cost of repairs, which the court found to be $573.97.

"Between February 13, 1879, and September 16, 1879, Bailey & Bratt paid to the plaintiff on the one-day note given to him by Bratt, $280.12. On July 5, 1882, Bratt was still liable on the several amounts which he agreed to pay, and which by the contract made by him with *Hoile* February 8, 1879, he had assumed, and which the said *Bailey*, by the parol agreement made on or about April 8, 1879, agreed and assumed to pay, as aforesaid, the sum of $20,307.29.

[This action was brought by *Hoile*, against *Bailey*, *Bratt*, and *McCulloch*, the complaint alleging, besides many of the facts above stated, that Bailey & Bratt had failed to pay, as they had agreed, the note to George Whitney, and that Mason, the holder of the mortgage given to secure such note, had obtained a judgment of foreclosure thereof. The plaintiff demands judgment that the defendants be restrained from further cutting or removing timber; that they

pay the taxes now due upon the lands, and the further sums which the plaintiff has been compelled to pay; that they redeem the judgment of foreclosure of the Mason mortgage, and if they will not pay, within a time to be fixed, the amounts so owing to the plaintiff, that they be foreclosed of all right in the premises and that the title be decreed to be in the plaintiff, subject only to said judgment of foreclosure of Mason's mortgage; that the conveyance to *McCulloch* be annulled, and that, in case the defendants shall fail within such fixed time to perform the agreements and make the payments aforesaid, *McCulloch* be decreed to convey the premises to the plaintiff, and that an account may be had, under the direction of the court, of the taxes unpaid, and the rents and profits of the mill, and the value of the timber cut by the defendants, and that the plaintiff have judgment therefor against the defendants.]

" The trial court came to the conclusions, in effect, that *Bailey*, upon becoming a partner with Bratt, became jointly liable with him for all the debts, claims, and liabilities which the latter had agreed and assumed to pay in his contract with *Hoile* on February 8, 1879; that *McCulloch* had taken the title to the land and advanced the money and paid Ebenezer Whitney, for the use, accommodation, and benefit of Bailey & Bratt, and under and in pursuance of a contract made by him and them with Whitney, and that Bailey & Bratt were still the equitable owners of the lands subject to the incumbrances; that Bailey & Bratt had made default, and that, unless they paid as required, the plaintiff was entitled to strict foreclosure barring them from all interest in the premises, and also entitling the plaintiff to recover from Bailey & Bratt the value of all timber cut and taken from the lands since February 8, 1879, and also the value of the use of the mill since that date; that *McCulloch*, also, was liable with Bailey & Bratt for the value of all the timber cut by Bailey & Bratt after the execution of the lease,

October 30, 1879, and that *McCulloch* was also liable with Bailey & Bratt for the value of the use of the mill from October 30, 1879; that, upon an accounting, the defendants were to be credited with all sums paid as of the time of such payments, respectively, and also the costs of repairs by *Mc-Culloch*, to be deducted from what he might be liable for, and that interest should be allowed on the balance due the plaintiff from the commencement of the suit.

"*Bailey* and *McCulloch*, respectively, excepted to each of the several findings of fact and conclusions of law. Such proceedings were thereupon had, that, on November 17, 1882, judgment was entered thereon, in effect barring and fore-closing the defendants of all rights in the premises, and restoring the same to the plaintiff free and clear from the lien of his contract to Bratt, and free and clear from any lien or incumbrance of the conveyance to *McCulloch*, and that the contracts and obligations given by Bailey & Bratt, or either of them, to the plaintiff on account of the purchase price be canceled, and also that the plaintiff have and recover from *Bailey*, Bratt, and *McCulloch* $8,235.80, dam-ages, and $158.36 costs; and that the plaintiff be let into possession on producing a certified copy of the judgment.

" The defendant *Bailey* appeals from the judgment and from the whole thereof, so far as it adjudges that the plaint-iff have and recover from him the sums of money therein named, or any sum of money whatever.

" The defendant *McCulloch* appeals from the judgment and the whole thereof, so far as it adjudges that he is barred and foreclosed of all rights in the premises described in the complaint, and that the same are restored to the plaintiff herein; and so far as it is considered by the said judgment that the plaintiff have and recover from him as one of the defendants, the sums of money therein named, or any sum of money whatever."

For the appellants there were briefs by *Raymond & Hasel-*

AUGUST TERM, 1883. 445

Hoile vs. Bailey, imp.    Hoile vs. McCulloch, imp.

*tine*, as attorneys, and *Winfield Smith*, of counsel, on behalf of *Bailey*, and by *Winfield Smith*, on behalf of *McCulloch*; and the cause was argued orally by *Mr. Smith*.

On behalf of the appellant *Bailey*, it was contended, upon the evidence, that he did not agree to become jointly liable with Bratt for the indebtedness of Hoile & Bratt connected with the purchase of the land. The judgment against him was therefore erroneous. A partner coming into a firm is not charged with former debts of the firm, and is not to be presumed so liable. *Catt v. Howard*, 3 Stark., 5; *Kirwan v. Kirwan*, 2 Cromp. & M., 617; *Ex parte Peele*, 6 Ves. Jr., 602; *Hartley v. Kirlin*, 45 Pa. St., 49; *Sternburg v. Callanan*, 14 Iowa, 251; Collyer on Part. (Perkins), sec. 521; *McLinden v. Wentworth*, 51 Wis., 170. A promise to pay the debt of a former partner (or other person) for which the former partner continues liable *after* the promise, is within the statute of frauds, and is void unless in writing. *Sternburg v. Callanan*, 14 Iowa, 251; *Anderson v. Davis*, 9 Vt., 136; *Eddy v. Roberts*, 17 Ill., 506; *Westheimer v. Peacock*, 2 Iowa, 528.

On behalf of the appellant *McCulloch*, it was argued, among other things, that the theory of a trust against him in favor of the appellant was unfounded. If the relation of debtor and creditor does not exist at the time of a conveyance, it is not a mortgage, and no subsequent agreement, unless in writing, can make it such. The title of *Hoile*, and *Bailey*, and Bratt, being gone by the judgment absolute, before the agreement of *McCulloch* to reconvey — even before the conveyance from Whitney to him — there was no interest which they could convey to him, or which he could receive by parol mortgage from them. *Glover v. Payn*, 19 Wend., 518; *Botsford v. Burr*, 2 Johns. Ch., 409; *Whiting v. Gould*, 2 Wis., 552; *Verner v. Winstanley*, 2 Sch. & Lef., 393; *Barrell v. Sabine*, 1 Vern., 268; *Conway v. Alexander*, 7 Cranch, 218; *Penn. Ins. Co. v. Austin*, 42 Pa. St., 257;

Hoile vs. Bailey, imp.    Hoile vs. McCulloch; imp.

*McDonough v. O'Niel*, 113 Mass., 92; *Payne v. Patterson*, 77 Pa. St., 134; *Shaw v. Erskine*, 43 Me., 371; *Treat v. Strickland*, 23 id., 234; *Warren v. Lovis*, 53 id., 463; *Carr v. Rising*, 62 Ill., 14; *Magnusson v. Johnson*, 73 id., 156; *Stephenson v. Thompson*, 13 id., 186; *Flagg v. Mann*, 14 Pick., 467; *Hill v. Grant*, 46 N. Y., 496; *Low v. Henry*, 9 Cal., 538; *Plumer v. Guthrie*, 76 Pa. St., 441, 457; 4 Kent's Comm. (2d ed.), 144; 1 Powell on Mortg., 130.   Where a person wished to purchase certain property, and, not being able to do it otherwise, induced a third person to become the purchaser, and he agreed to convey it to the former, if the relation of debtor and creditor is not created between the parties the transaction is not a mortgage.   *Galt v. Jackson*, 9 Ga., 151; *Henley v. Hotaling*, 41 Cal., 22–28; *Usher v. Livermore*, 2 Iowa, 117; *Rich v. Doane*, 35 Vt., 125. While Bailey & Bratt were operating the mill, *McCulloch* could not be charged with rents and profits.   *Bailey v. Myrick*, 52 Me., 136; *Gibson v. Crehore*, 5 Pick., 146; *Charles v. Dunbar*, 4 Met., 498.   The lease not acted upon was without effect on the obligations, as it was upon the conduct of the parties.   *Hill v. Gomme*, 1 Beav., 541, 555.

*G. W. Cate*, for the respondent, contended, *inter alia*, that *McCulloch* was liable for the timber cut by Bailey & Bratt after the deed from Whitney, and for use and occupation from that time, because he assumed control of the premises as owner and did in fact control them, although it would seem for the purpose of enabling Bailey & Bratt to go on and get the benefit of the land without bearing its burdens.   *Chirac v. Reinicker*, 11 Wheat., 280; Hill on Trustees, 791; 1 Hilliard on R. P. (4th ed.), 588.   He took actual possession, if only a mortgagee, when he made the lease to *Bailey* and authorized him to cut down the timber and use the mills, reserving compensation and rent, and thereby became liable for rents and profits, and timber cut, for what might with due diligence have been made.   Hill on Trustees, 817; *Blaney v.*

*Bearce*, 2 Greenl., 132; *Gore v. Jenness*, 19 Me., 53; 1 Hilliard on R. P. (4th ed.), 569, 570, note 1; 2 White & Tudor's L. C. in Eq., 2010. When *McCulloch* took the title from Whitney, he became bound to hold it as a primary fund for the payment of the liens subsequent to the claim he was paying off, or pay them himself. *Weber v. Zeimet*, 30 Wis., 283; *Sweetzer v. Jones*, 35, Vt., 317; *Jumel v. Jumel*, 7 Paige, 591; *Webb v. Meloy*, 32 Wis., 319; *Greither v. Alexander*, 15 Iowa, 470.

Cassoday, J. The failure to furnish a complete, consecutive, and succinct statement of the facts involved, with appropriate references, has made it extremely difficult to comprehend the merits of the real contention on either side. After a very thorough reading and re-reading of the printed case, and as careful an examination of the voluminous unprinted record as time will permit, we are still in doubt as to some of the facts involved. Upon such doubtful questions of fact we are, therefore, necessarily forced to acquiesce in the findings of the trial court. These facts, together with such as are clearly established by the record, are stated above, and need not be here repeated. The conclusions of fact and law to be drawn from such statement remain to be considered. This is an action for the strict foreclosure of the contract executed February 8, 1879, whereby Bratt purchased of *Hoile* the lands and mills in question. *Bailey* and *McCulloch* each separately defended, and each bring separate appeals. Both are urging, however, that the plaintiff has lost his cause of action, if he ever had any, by reason of the strict foreclosure of the contract given by Ebenezer Whitney on the sale of the land, November 22, 1875, and the deed from him to *McCulloch*, October 23, 1879, whereby it is claimed that the title became absolutely vested in the latter, discharged of all claim of the plaintiff, and all liens and incumbrances accruing after the date of that contract. It

appears that the title was allowed to become absolute in Ebenezer Whitney, and the deed from him to *McCulloch* was made in pursuance of an agreement and understanding made and had with them and *Bailey* in behalf of the firm of Bailey & Bratt, as above stated. From what was said and done at the time, and subsequently, there can be no question but what the title was allowed to be made absolute, and the deed given and accepted for the use and benefit of Bailey & Bratt.

It is well settled that where the owner of the equity of redemption procures another to advance money and bid in his property on sheriff's sale, and take the title thereof for the benefit of such owner, with the understanding that he will reconvey the same to such owner on repayment of the money so advanced and interest, the transaction in equity constitutes a mortgage. *Sweet v. Mitchell*, 15 Wis., 641; *Spencer v. Fredendall*, 15 Wis., 666; *Wilcox v. Bates*, 26 Wis., 465. The same principle has been applied to a case where lands were purchased from a third person for the use and benefit of one in possession. *Starks v. Redfield*, 52 Wis., 349. Here *McCulloch* merely advanced the money and took the title as security at the request, and for the use and benefit, of Bailey & Bratt, and for that purpose and with that understanding the title was allowed to become absolute in Ebenezer Whitney. Thereby Bailey & Bratt became, in equity, debtors to *McCulloch* for the money so advanced and to be advanced, and he became their creditor. Whenever property is transferred, no matter in what form or by what conveyance, as the mere security for a debt, the transferee takes merely as a mortgagee, and has no other rights or remedies than the law accords to mortgagees. Id., 352. Under the facts and authorities, *McCulloch* must be regarded as a mere mortgagee of Bailey & Bratt, or at least of Bratt.

2. It is claimed on the part of *Bailey*, who negotiated

the transaction, that he never, in fact, purchased nor agreed to purchase any interest in the equity of redemption; and that if he did so agree, yet that the agreement was by parol and void under the statute of frauds. But the trial court has found that he did make such an agreement, and the evidence to the contrary is not sufficiently convincing to justify us in disturbing that finding.

Was the agreement void under the statute by reason of its being in parol? In consideration of Bratt's equitable interest in the lands, mills, buildings, and his other property being put into the firm as partnership property, *Bailey* agreed, as such partner, to assume with Bratt the payment of the debts of Bratt to *Hoile* and the several claims which Bratt had assumed and agreed to pay. Upon that agreement being made, *Bailey*, as a partner with Bratt, immediately entered into complete possession of the mills, buildings, and real estate as such partner, and the firm thereupon cut and removed from the land large quantities of logs and timber, and manufactured the same into lumber and other things, and sold and converted the same to their own use. Do the facts bring the case within subd. 2, sec. 2307, R. S., which declares that " every special promise to answer for the debt, default, or miscarriage of another person," " shall be void, unless such agreement, or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith." This language has given rise to much contrariety of opinion in different courts, and sometimes in the same court, not only as to the several classes which do and which do not come within its provisions, but also as to the precise language in which to state the rule of law applicable to a given class. We have no purpose of reviewing, much less of attempting to reconcile, these decisions, nor of considering the law applicable to any class of cases except the one here presented.

In *Young v. French*, 35 Wis., 116, the present chief jus--

tice stated one distinction between cases within and without the statute thus: "Where the party promising has for his object some benefit and advantage accruing to himself, and on that consideration makes the promise, this distinguishes the case of an original undertaking from one within the statute." This is quoted approvingly by Mr. Justice LYON in the recent case of *Clapp v. Webb*, 52 Wis., 641. The facts in each of those cases differ from the facts here, but the distinction thus stated is substantially the same as that announced by Chief Justice SHAW in *Nelson v. Boynton*, 3 Met., 400, which was followed in *Alger v. Scoville*, 1 Gray, 397; *Draper v. Putnam*, 7 Allen, 174; *Burr v. Wilcox*, 13 Allen, 273; *Ames v. Foster*, 106 Mass., 403. To the same effect is the able opinion of POLAND, C. J., in *Fullam v. Adams*, 37 Vt., 403. The rule thus stated also received the sanction of Chief Justice SAVAGE in these words: "In all these cases, founded on a new and original consideration of benefit to the defendant or harm to the plaintiff, *moving to the party making the promise*, either from the plaintiff or original debtor, the subsisting liability of the original debtor is no objection to a recovery." *Farley v. Cleveland*, 4 Cow., 439. "This language," was said by COMSTOCK, C. J., in the leading case of *Mallory v. Gillett*, 21 N. Y., 419, to have "greater precision than that of Chief Justice KENT" in the much-criticised case of *Leonard v. Vredenburgh*, 8 Johns., 29. In the case of *Mallory v. Gillett, supra*, the meaning of this statute was ably discussed, both in the opinion of the majority and minority of the court, and although the two opinions are in direct conflict upon the question there involved, yet they substantially agree, among other things, as to the rule of law applicable to the case here presented. That rule of law may be summarized thus: Where B. purchased property of A. on credit, and thereupon sold the same to C., who, in consideration therefor, and as a part of the purchase price thereof, promised to pay B.'s debt to A. upon the

former purchase, such promise on the part of C. is nothing more nor less than an agreement to pay his own debt, although the incidental effect of such payment would be to pay and discharge B.'s debt to A.

A different rule might be inferred from a remark of Dixon, C. J., in *Dyer v. Gibson*, 16 Wis., 559, where the consideration moved from the plaintiff to the defendant, and not from the original debtor to the defendant, as here. He there said: " The distinction is between cases where the person promising has for his object a benefit accruing to himself, *in which the original debtor has no interest, and from which he derives no advantage*, and cases where his primary and leading object is to become surety for the debt of another without benefit to himself, but for the exclusive advantage of the other parties to the contract." But the same learned judge, in the later case of *Putney v. Furnham*, 27 Wis., 187, virtually eliminated the words in italics from the proposition. In that case the defendant purchased certain property of one Corbett, and as a part of the purchase price agreed with him to pay certain debts incurred by Corbett on a former purchase of the same property, and although the original debtor did have an interest in the sale to the defendant, and did derive an advantage from his promise, yet Dixon, C. J., observed, that "it was a guaranty in form, but not in substance or effect, within the meaning of the statute of frauds. It was not a *mere* promise by the defendant to be responsible for the debts of Corbett to those parties, and to pay those debts, but a promise by him to pay *his own debt* in that particular way. It was a promise founded upon a new and sufficient consideration *moving to the promisor from the debtor* at the time the promise was made. Such a promise or agreement is not within the statute of frauds." This enunciation is in strict harmony with the rule above stated. The mere fact that *Bailey* did not contract with *Hoile* personally, and that the consideration for the promise of the former did not move

to him from *Hoile*, but from Bratt, is no valid reason why
*Hoile* should not be allowed to enforce the contract made by
Bratt with *Bailey* for his benefit. *Cotterill v. Stevens*, 10
Wis., 422; *Putney v. Farnham, supra; Bassett v. Hughes*, 43
Wis., 319; *Kollock v. Parcher*, 52 Wis., 399; *Houghton v.
Milburn*, 54 Wis., 561. We must therefore conclude that
the parol contract between *Bailey* and Bratt was not within
the statute of frauds, and hence that the former took the un-
divided one-half of all the property held by Bratt under his
contract with *Hoile*, subject to the liens and claims of the
latter, which *Bailey*, in consideration of the purchase, thereby
became equally bound to pay, and which *Hoile*, as vendor,
could enforce against both *Bailey* and Bratt in this action.

3. Having determined the relations of the parties, it be-
comes necessary to consider whether the plaintiff can re-
claim the land, and at the same time recover damages by
reason of waste upon the land in this action of strict fore-
closure. It was held in *Button v. Schroyer*, 5 Wis., 598,
that the proper decree in an action of strict foreclosure is
"that the money due upon the contract be paid within such
reasonable time as the court may direct, or that the vendee
be foreclosed of his equity of redemption." A judgment
foreclosing the contract and directing a sale of the premises,
and payment of the amount due and a personal judgment
for any deficiency was reversed in *Baker v. Beach*, 15 Wis.,
99, for not complying with that rule. The practice thus
indicated was followed in *Kimball v. Darling*, 32 Wis., 675;
*Landon v. Burke*, 36 Wis., 378; *Church v. Smith*, 39 Wis.,
492. Here the interlocutory order provided that unless Bai-
ley & Bratt paid the amount due as specified within the
time limited, then, upon proof of such failure and notice, the
plaintiff should have judgment against them and *McCulloch*,
and all persons claiming by, through, or under them since
the commencement of the suit, forever barring and foreclos-
ing them, and each of them, from all right, title, and inter-

AUGUST TERM, 1883. 453

Hoile vs. Bailey, imp.    Hoile vs. McCulloch, imp.

est in and to the premises, or any part thereof; and in that event the plaintiff was also to recover of and from Bailey & Bratt the value of the use of the mill, and all timber cut and taken from the land after February 8, 1879, and that *McCulloch* should also be held liable with Bailey & Bratt for the value of the use of the mill and all timber cut by them after October 30, 1879. Default having been made, a judgment absolute was entered therein, barring and foreclosing the defendants of all rights in the premises, and restoring the same to the plaintiff, free and clear of all claim or lien of any of the defendants, and authorizing the plaintiff to recover of *Bailey*, Bratt and *McCulloch* $8,235.80 damages for the timber cut and the use of the mill as aforesaid and for costs, and to be let into possession. Was the plaintiff entitled to such damages in this action?

In *Beckwith v. Philleo*, 15 Wis., 223, the vendee was to pay taxes and have possession and use of the premises without impeachment of waste or claim of damages against him, so long as he performed the conditions on his part to be performed; and it was held that the vendee had a right to cut timber from the land, and that such right passed to his assignee; and further, that a default of the assignee in not delivering the instalment of lumber when due, did not give the vendor any property in the lumber cut, and hence that he could not maintain replevin for it. In *Seatoff v. Anderson*, 28 Wis., 212, it was held, in effect, that the vendee in possession, and in default of payment, under an executory contract, had no right to remove buildings erected upon the premises, and that a stranger removing such buildings under the alleged authority of such vendee was liable in damages to the owner of the legal title. In *Huebschmann v. McHenry*, 29 Wis., 655, it was held, in effect, that where one acting under a claim of right, adverse to the true owner, entered upon the premises of another and erected a building thereon so as to become a fixture, and then, after being

evicted, again entered upon the land and removed the same, such severance converted the building into personal property, and the land-owner could thereupon reclaim the building from such trespasser in an action of replevin. In *Northrup v. Trask*, 39 Wis., 515, the vendee had agreed to erect a house on the lot purchased of the plaintiff, which he did, and thereafter removed the house and attached the same to a lot belonging to the defendant, to whom he was indebted for the lumber with which he built the house. The house having thus become the realty of the defendant, it was held that he was not liable for its conversion and value to the plaintiff as the vendor of the first lot upon which it was erected.

The above cases were all actions at law, and hence not strictly applicable. This is an equitable action, and the court should, as far as possible, enforce good conscience between the parties. There may be some things said in *Northrup v. Trask, supra,* from which it may be inferred that damages for waste can in no case be recovered by the vendor against the purchaser. But without affirming or denying all that is there said, it is enough here to say that that case is clearly distinguishable from the one before us. By the terms of the contract of February 8, 1879, here sought to be enforced, Bratt was to have and take immediate possession of the lands, and all the personal property formerly belonging to the firm of Hoile & Bratt, and to have the right to cut the timber on the lands and manufacture the same into lumber in the usual course of said business: provided, that there should at all times be left standing on said lands sufficient good pine timber, the stumpage of which, at $1.50 per thousand feet, should be sufficient in quantity to cover and include all the indebtedness and liability owing or assumed by Bratt as stated. It was under that agreement that *Bailey* went into possession with Bratt, and, with the liabilities he assumed, he became entitled to the same rights

AUGUST TERM, 1883.        455

Hoile vs. Bailey, imp.    Hoile vs. McCulloch, imp.

that Bratt had under the agreement. Manifestly the contract contemplated the continuance of the business right along as it had been conducted by Hoile & Bratt;— that the mill should be used, and the timber cut and manufactured into lumber and sold, provided, only, that the limit in cutting pine timber, specified, should not be transcended.

The use thus expressly stipulated for could not be enjoined, nor give the plaintiff any ground of complaint. Nor could any cutting of timber, except such "good pine timber" as was expressly reserved as security. What would be the rights of the respective parties, in the absence of such express stipulation, is not before us for consideration. Here the parties to the contract did stipulate, and hence the terms of their stipulation must be considered in determining their rights and liabilities. In this respect the case is like *Beckwith v. Philleo, supra.* Without continuing the discussion, we must hold that Bailey & Bratt were not liable as for waste in damages for the use of the mill, but were liable for all good pine timber cut in excess of the amount prohibited by the contract. But the value of such excess so cut is not necessarily to be limited to the price named in the contract, as. that price was named merely for the plaintiff's benefit and to keep good his securities. It appears from the findings, however, that at the time of making the contract of February 8, 1879, there was not sufficient in quantity of good pine timber standing upon the land, at $1.50 per thousand feet, board measure, to cover and include all the indebtedness and liability owing and assumed by that contract. This being so, it follows that Bailey & Bratt had no right, under the contract, to cut any pine timber from the land. Having done so in violation of the contract, they were bound in equity to pay, from the timber so cut, at least the amount of the value of the stumpage, upon the debts which they had assumed and agreed to pay. The court found that Bailey & Bratt had cut and removed from the premises 4,000,000 feet of

pine lumber, and that the same was worth $1.65 per thousand feet, board measure, or $6,600. For this amount, therefore, they were properly answerable in damages. But it appears that they had actually paid more than that amount upon the debts which they had assumed and agreed to pay. It may be, however, that these payments, or some portion of them, were realized from other sources; but in so far as they were realized from pine timber so cut by them from the premises, the amount of the value of such stumpage, as damages, should be reduced. This court will, therefore, allow testimony to be taken of the amount of such payments (if any) as were made from money or property realized from the pine timber so cut from the premises, and when ascertained the same must be deducted from the value of the stumpage so found ($6,600), and the balance (if any), with interest from the time of such cutting, the plaintiff will be entitled to, as damages, against Bailey & Bratt in the final judgment of strict foreclosure. It follows that that portion of the judgment from which the defendant *Bailey* has appealed is reversed, and the cause, as to him, is remanded for further proceedings according to law.

4. *McCulloch's* relation to the property and the parties is different, and the damages to be recovered against him stand upon different ground. He took the title from Ebenezer Whitney as security for money advanced and to be advanced, and for the use of Bailey & Bratt, as above stated. He held the legal title as mortgagee merely. His claim, however, was prior in time and right to every other claim or lien upon the premises. *McCulloch* took actual possession of the mill, April 1, 1880, and held it until April 1, 1881. During that time he manufactured in the mill, as found by the court, 3,230,215 feet of lumber, and the value of the use of the mill and premises to manufacture the same was eighty-five cents per thousand feet, board measure, or $2,745.68; and during the same time he manufactured in the mill 1,500,000 shin-

gles, and the value of the use of the mill and premises to manufacture the same was fifteen cents per thousand, or $225, making in all for such use $2,970.68. None of the timber from which *McCulloch* so manufactured lumber and shingles was taken from the premises in question. The court found that during the time *McCulloch* was so in the possession and use of the mill, he expended for repairs $573.97, for which sum the court found he was entitled to credit upon so much and such part of the judgment as he, *McCulloch*, was liable to pay. *McCulloch* had also paid Ebenezer Whitney, as a part of the consideration of the conveyance to him from the latter, $900, no part of which was ever repaid to him by Bailey & Bratt, or either of them, nor any one, except as he got it back by way of the use of the mill and premises, as stated. For the purpose of obtaining payment of the amount so advanced, *McCulloch* had the right to the possession of the mill and premises, and use of the same, as against the plaintiff and all other claimants.

The question recurs, For what amount was *McCulloch*, as such mortgagee, liable to the plaintiff? The doctrine was settled in *Wilcox v. Bates*, 45 Wis., 138, that " trustees in possession are in general chargeable with actual receipts only, except upon proof of gross negligence or of fraud in lessening or concealing receipts; and a mere attempt by them to ignore the trust and deal with the property as their own, is not such a fraud as will charge them beyond actual receipts; nor does it tend to prove, but rather repel, negligence in the administration of the estate." Here the actual receipts would be the value of the use. Unless there is something in the case at bar to take it out of the rule thus settled, it is evident that *McCulloch* was only chargeable with such use; and the difference between the value of such use and the sum of the amount due him on the purchase price and the repairs allowed, would be the true amount for which the plaintiff was entitled to judgment against him.

That difference was $1,496.71. Is there anything in the case which takes it out of the rule thus settled and makes *McCulloch* liable to the plaintiff for any part of the timber cut by Bailey & Bratt, or the use of the mill by them? Certainly there can be no ground for such claim by reason of the purchase from Whitney, nor of the manner in which it was effected. There is no evidence that the plaintiff knew anything about it until long after it was completed. Whitney's judgment was about to become absolute; and had it not been for the fact that the purchase was brought about by *Bailey* in the manner indicated, the plaintiff's claim upon the mill and real estate would have been thereby wholly terminated and forever extinguished. Instead, therefore, of being an injury to or in any fraud of the plaintiff's rights, it was the only thing which preserved to him the continuance of any claim to the premises. Nor do we think that the mere fact that Bailey & Bratt did their business at *McCulloch's* bank,— depositing their money and drawing it out like other customers,— is any evidence of fraud, or any reason why *McCulloch* should be held chargeable with the money thus passing through the bank.

The only circumstance from which it can be plausibly argued that *McCulloch* should be held liable for the action of Bailey & Bratt prior to the time when he took actual possession, April 1, 1880, is the execution of the lease to *Bailey*, October 30, 1879. At that time Bailey & Bratt were in possession of the property, and using it as a firm, the same as they had for a long time previously. The lease did not run to the firm, but to *Bailey* alone. There is no evidence that Bratt had anything to do with or about the lease, nor that he had any knowledge or information of its execution until after *McCulloch* had taken possession, but the evidence is to the contrary. Bratt, as a member of the firm, continued in possession, cut timber, and ran the mill after the lease the same as he had done before. The

lease was not a matter of negotiation, nor of terms insisted upon or exacted by *McCulloch*. He seems to have executed the lease because it was requested of him by *Bailey*. The lease seems to have been drawn at the instance and under the direction of *Bailey*. There is nothing about it, nor in the evidence, to indicate that Bratt or the firm were to hold possession under the lease. It ran to *Bailey* alone, and was signed by *McCulloch*, and him alone. It did not purport to put *Bailey* or any one in possession, but merely to " authorize and empower" *Bailey*, " for the consideration and upon the terms and conditions" therein stated, " to enter upon and take, possession " of the " lands and premises " therein described. There is no evidence that such authority or power was ever exercised by *Bailey*, or any one in his .behalf, or that *McCulloch* ever received or claimed anything of *Bailey* under the lease. The property was treated by all the parties until April 1, 1880, as though no lease had ever been made by *McCulloch*, and no .deed ever made to *Mc-Culloch*.

There is no evidence tending to show that the plaintiff was ever deceived or misled by reason of the lease, or that he ever had any knowledge or information of its existence, until long after Bailey & Bratt abandoned the premises. The execution of the lease seems to have been a secret, known only to *Bailey*, Raymond, and *McCulloch*. *McCulloch* does not seem to have had any purpose in its execution. The motive of *Bailey* in having it so executed is, at most, mere conjecture. He may have thought that the deed to *McCulloch* gave him the absolute title to the land, and that, as he had personally negotiated the transaction, he might with such a lease drive Bratt from the possession, and take the same to himself; and then, by repudiating Bratt's contract with *Hoile*, he might, through *McCulloch*, obtain a good share of the property for himself, discharged of all incumbrances. A lease seems to be the common resort to strengthen

the apparent legal title, when taken merely as security. *Plato v. Roe*, 14 Wis., 453; *Ragan v. Simpson*, 27 Wis., 355. But the failure of both *Bailey* and *McCulloch* to ever exercise, assert, or claim any right or privilege under the lease, or to inform the plaintiff, or any other person, of its existence, leaves us to guess at the motive which prompted its secret execution and retention. It is quite obvious, however, that such mere secret execution and retention never operated to prevent the plaintiff from redeeming the property from Ebenezer Whitney before his judgment became absolute, nor from redeeming the same from *McCulloch* after he got the deed. On the contrary, he was at perfect liberty all the time to proceed against Bailey & Bratt as he might be advised, and also to redeem from *McCulloch*. Under all the circumstances, we are constrained to hold that there is nothing in the case which takes it out of the settled rule above stated, nor that would make *McCulloch* answerable for the acts of Bailey & Bratt in cutting timber upon the premises prior to the time he in fact took possession.

It follows that that portion of the judgment appealed from by the defendant *McCulloch* is reversed, and as to him the cause is remanded, with direction that in the final judgment of strict foreclosure the plaintiff have and recover of *McCulloch*, as damages, the sum of $1,496.71, with interest thereon from April 1, 1881.

*By the Court.*— Ordered accordingly.