(84 South. 280)

McKLEROY et al. v. MUSGROVE.
(6 Div. 516.)

(Supreme Court of Alabama. Nov. 13, 1919. Rehearing Denied Jan. 22, 1920.)

1. PARTNERSHIP ⟸99—PARTNER WHO COMPETES INDIVIDUALLY WITH FIRM MUST TURN OVER PROFITS.

Generally a partner, who without the consent of his copartners and in competition with the business of the partnership, conducts a separate business, must turn his profits into the partnership's coffers.

2. PARTNERSHIP ⟸99—MEMBER OF FIRM MAY ENGAGE IN OUTSIDE BUSINESS.

In absence of express covenants, a partner may engage in as many outside businesses as he pleases, provided he does not deprive the firm of a portion of the skill, industry, and capital which he ought to devote to it, according to the inferred intention of the partners.

3. PARTNERSHIP ⟸274—FIRM DISSOLVED BY ADJUDICATED INSANITY OF MEMBER WITH APPOINTMENT OF GUARDIAN.

Adjudicated insanity of a partner and the appointment of a guardian for his estate, together, if not separately, dissolved the firm, as of which date it was equitable an accounting should begin at the instance of the widow of such insane partner.

4. PARTNERSHIP ⟸338 — ENTRIES IN FIRM BOOKS EVIDENCE IN SETTLING ACCOUNTS, AND DEEMED PRIMA FACIE CORRECT.

Entries in books of firm to which members have had free access are evidence for and against partners in settling partnership accounts, and to extent they consist with one another and point to definite conclusions as between partners and their representatives must be prima facie correct, though, if errors are shown, they should be corrected in stating the account, and, if they require explanation, they may be explained by an expert.

5. PARTNERSHIP ⟸68(1)—REALTY PURCHASED FOR FIRM BUSINESS BECOMES FIRM PROPERTY.

Real estate purchased by partners for the firm business and with firm funds becomes firm property, irrespective of manner in which bought, and in whose name it stands.

6. TRUSTS ⟸84 — TRUSTS IN FIRM LAND STANDING IN NAME OF SINGLE PARTNER NEED NOT BE EXPRESS.

Court of equity will always supply want of express trust in realty purchased by firm with firm funds, title to which is taken in name of one member, if only trust exists and is capable of proof, and land in fact and substance is partnership property; doctrine resting on foundation of resulting trust.

7. PARTNERSHIP ⟸68(1)—EQUITABLE OWNERSHIP OF PROPERTY PAID FOR WITH FIRM FUNDS A QUESTION OF FACT.

Though property has been paid for with firm funds, its equitable ownership is a question of intention; a question of fact, to be determined on consideration of the conduct of the partners, or by their agreements, express or implied.

8. PARTNERSHIP ⟸68(1)—CONDITION OF TITLE TO LAND IN NAME OF PARTNER PRIMA FACIE INDICATED BY DEED.

Prima facie the condition of title to lands standing in the name of a partner is precisely that, which is indicated by the muniment of title.

9. PARTNERSHIP ⟸336(3) — EVIDENCE HELD NOT TO JUSTIFY CHARGE OF FRAUDULENT CONCEALMENT OF ASSETS BY PARTNER.

In suit by widow of deceased partner for accounting and settlement, evidence *held* insuf-

ficient to justify charge of fraud through concealment of assets against defendant partner.

**10. EVIDENCE** ☞277—DECLARATIONS OF DECEASED PARTNER CONSIDERED ON QUESTION OF TITLE TO PROPERTY.

In suit for accounting by widow of deceased partner, declarations of such partner, referring to particular property as property of defendant partner, are to be considered in determining whether defendant partner is under resulting trust as to such property.

**11. ESTOPPEL** ☞92(3) — SUCCESSORS OF DECEASED PARTNER, HAVING RETAINED CONSIDERATION MOVING TO HIM, CANNOT QUESTION SALE.

It does not lie in mouth of plaintiffs, claiming under a deceased partner, having accepted and retained consideration for certain stock sold, which moved to their predecessor, to claim such stock as partnership assets, nearly 15 years after such sale, and long after another sale by buyer company to another company.

**12. PARTNERSHIP** ☞336(3) — ACQUIESCENCE OF FIRM MEMBER IN CLAIM BY OTHER PERSUASIVE.

Fact that deceased partner accepted claims of surviving partner to certain property, and never questioned them in his lifetime, is persuasive, in suit for accounting by successors of deceased partner, that equitable rights of partners were as found by register, in favor of surviving partner.

**13. APPEAL AND ERROR** ☞931(10), 1018—FINDINGS OF REGISTER PRESUMED CORRECT AND STAND ON FOOTING OF VERDICT OF JURY.

Where there was evidence, much of it delivered ore tenus before register, to sustain his findings in suit for accounting by successors of deceased partner, his report in such circumstances stands on footing of verdict of jury, and all reasonable presumptions must be indulged in its favor.

**14. PARTNERSHIP** ☞99 — MEMBER OF FIRM HAD RIGHT TO ACQUIRE CORPORATE STOCK FOR HIMSELF.

A member of a partnership dealing in coal and timber lands had a right at any time to acquire for himself shares of stock in a land company, provided he used his own means to such end.

**15. PARTNERSHIP** ☞336(3)—EVIDENCE HELD NOT TO WARRANT FINDING OF CONCEALMENT IN ACQUISITION OF STOCK BY PARTNER.

In suit for accounting against surviving partner by successors of deceased partner, evidence *held* insufficient to warrant finding there was any concealment or other fraud by surviving partner in acquiring for himself certain stock in land company.

**16. PARTNERSHIP** ☞78—FIRM MEMBER, DEALING WITH ITS STOCK AS HIS OWN, CHARGEABLE ONLY WITH VALUE OF USE.

Surviving partner's attempt, during existence of firm, to ignore trust in favor of firm in its corporate stock pledged by him, thus dealing with it as his own, *held* not on strictest theory of liability to charge him with more than value of use.

**17. WITNESSES** ☞159(12)—TESTIMONY AS TO TRANSACTION WITH DECEASED PARTNER INCOMPETENT.

A surviving partner's testimony, in suit by successors of deceased partner for accounting, as to how he acquired certain stock from deceased partner, was incompetent.

**18. PARTNERSHIP** ☞336(3)—EVIDENCE HELD TO AUTHORIZE FINDING CORPORATE STOCK WAS OWNED BY SURVIVING PARTNER.

In suit for accounting by successors of deceased partner against surviving partner, evidence *held* to authorize finding by register that certain stock in name of surviving partner stood in name of true owner.

**19. PARTNERSHIP** ☞336(3)—EVIDENCE HELD NOT TO SHOW STOCK IN SURVIVING PARTNER'S NAME WAS NOT OWNED BY HIM.

In suit for accounting by successors of deceased partner against surviving partner, evidence that defendant partner did not own certain corporate stock standing in his name *held* insufficient to overcome prima facie case made for him by certificate itself.

**20. PARTNERSHIP** ☞336(1)—PRESUMPTION IN FAVOR OF SURVIVING PARTNER THAT DECEASED PARTNER AUTHORIZED GIFT.

In suit for accounting by successors of deceased partner against surviving partner, in view of circumstances and after long acquiescence by deceased partner, *held*, that it should be presumed, in favor of surviving partner, that deceased partner authorized in advance gift of certain stock to third person for benefit of his children, nephew and niece of partners, brothers, or else, afterwards informed of gift, ratified it.

**21. TRUSTS** ☞77—TRUST RESULTS FROM PURCHASE WITH TRUST FUNDS ONLY WHERE PAYMENT IS COEVAL WITH CONVEYANCE.

To create a resulting trust through purchase of property with trust funds, application of such funds to payment of purchase money must be coeval with conveyance; subsequent use of trust funds in payment of trustee's obligation not being sufficient.

**22. TRUSTS** ☞84—USE OF FIRM FUNDS ON DEPOSIT WITH TRUST COMPANY IN PURCHASE BY PARTNER DID NOT CREATE RESULTING TRUST.

Where funds of partnership on deposit with trust company owned by it were used by partner in purchasing property for himself, no trust resulted in favor of firm on any theory of use of its funds in purchase; trust company being a separate legal entity from firm, and its funds not being funds of any one or two stockholders, any more than of others.

**23. PARTNERSHIP** ☞68(2)—LAND OWNED BY FIRM PROPERTY OF INDIVIDUAL MEMBERS, AND NOT PERSONALTY.

Land owned by partners, one of whom conveyed his half interest in part payment for certain stock, *held* clothed in all its legal characteristics as property of individual members of firm or their separate alienees as tenants in common, and not personalty under any doctrine of conversion for purposes of suit for accounting by successors of deceased partner.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

24. PARTNERSHIP ⬡⟿249, 251 — SURVIVING PARTNER, GUARDIAN AND ADMINISTRATOR OF INSANE PARTNER, DECEASED, NOT CHARGEABLE WITH PROFITS AS THROUGH USE OF FIRM FUNDS.

Surviving partner, first guardian and then administrator for his insane partner, subsequently deceased, held not accountable for profits realized by him through pledge of corporate stock, in which deceased partner was interested individually with himself, in buying corporate stock through another company which he controlled.

25. PARTNERSHIP ⬡⟿336(1) — PRESUMPTION AGAINST SURVIVING MEMBER KEEPING INCORRECT ACCOUNTS.

Every presumption is indulged against a party, as a surviving partner, who has willfully kept incorrect accounts.

26. PARTNERSHIP ⬡⟿333 — CHARGE AGAINST SURVIVING PARTNER FOR INTEREST ON FIRM FUNDS USED HELD SUFFICIENT.

In proceedings for accounting by successors of deceased partner against surviving partner, charge against surviving partner for interest to date of settlement on firm funds deposited in bank to his individual credit and drawn against for individual use held sufficiently to compensate plaintiffs, and to satisfy demands of equity.

27. WITNESSES ⬡⟿276 — SURVIVING PARTNER, EXAMINED BY ADVERSARY AS TO DEAL, COULD NOT BE CONFINED TO YES OR NO ANSWER.

In suit for accounting against surviving partner by successors of deceased partner, if defendant partner was to be examined by his adversaries as to fact of deal between partners inquired about, he was entitled to state whole truth, constituent facts of deal, and could not be confined to a yes or no answer.

28. PARTNERSHIP ⬡⟿336(3) — EVIDENCE HELD TO SUSTAIN FINDING THAT STOCK WAS INDIVIDUAL PROPERTY OF SURVIVING PARTNER.

In proceedings for accounting by successors of deceased partner against surviving partner, evidence held to sustain register's finding certain shares of stock in coal company were individual property of defendant partner, so as to be credited to him.

29. PARTNERSHIP ⬡⟿245(3) — SURVIVING PARTNER COULD SELL FIRM STOCK TO SELF.

A surviving partner had a right to make a sale to himself honestly at full value of corporate stock owned by the firm.

30. PARTNERSHIP ⬡⟿336(3) — EVIDENCE HELD TO SHOW THAT SALE OF FIRM STOCK BY SURVIVING PARTNER TO SELF WAS HONEST.

In suit for accounting by successors of deceased partner against surviving partner, evidence as to defendant partner's honesty and giving full value on sale to himself of corporate stock owned by firm held to sustain conclusion of register sale was valid and gave good title.

31. PARTNERSHIP ⬡⟿336(3) — EVIDENCE HELD TO SHOW SURVIVING PARTNER ENTITLED TO CERTAIN STOCK.

In suit for accounting by successors of deceased partner against surviving partner, evidence held to sustain register's conclusion plaintiffs were without interest in a trust company's stock derived by defendant partner from land company in payment of claim for personal services.

32. PARTNERSHIP ⬡⟿336(2) — TESTIMONY OF SURVIVING PARTNER AS TO CLAIM TO PROPERTY COMPETENT IN ACCOUNTING SUIT.

In suit for accounting by successors of deceased partner against surviving partner, testimony of defendant that he acquired a newspaper, claimed by plaintiffs as firm assets, as far back as 1880, and that it was his own property, was competent.

33. PARTNERSHIP ⬡⟿333, 336(3) — MISTAKE IN REGISTER'S STATEMENT OF ACCOUNTS OF SURVIVING PARTNER PROPERLY ALLOWED TO BE CORRECTED.

In suit for accounting by successors of deceased partner against surviving partner, defendant's statement of account was prima facie evidence of its correctness as against himself; but a mistake in register's statement was properly allowed to be corrected.

34. APPEAL AND ERROR ⬡⟿924 — SUPREME COURT PRESUMES CHANCELLOR ELIMINATED ERRORS OF REGISTER ON EVIDENCE.

If register committed errors in respect of rulings on admissibility of evidence, Supreme Court must presume consequences of such errors were eliminated by chancellor.

Appeal from Circuit Court, Walker County; J. J. Curtis, Judge.

Bill by Susan N. McKleroy and others against L. B. Musgrove, as administrator and individually, for an accounting and settlement of administration. From the decree, complainants appeal. Affirmed.

The facts in this case were contained in seven large volumes of records and are too voluminous to be set out. The court in its opinion indicates sufficiently the facts leading to the conclusion. The following assignments of error are set out:

(76) The court erred in sustaining the action of the register in charging the estate of J. C. Musgrove with a firm debt to Mrs. Bradford and in holding that the firm had no connection therewith.

(79) In sustaining the register's action in voluntarily giving credit to the defendant for $80 for an alleged interest item, without any claim therefor by the defendant in his said account, and without any motion to surcharge his said account.

(80) In sustaining the register's action as to a certain disbursement for the Minnie Allen mortgage, which was paid during the existence of the firm with firm funds.

(82) Same as 81.

(83) In sustaining the register's action in allowing the defendant a certain credit for Provident Life mortgage and certain interest thereon, which was paid during the firm's existence with funds of the firm.

(84) In sustaining the register's action in allowing to the defendant a credit claimed to

⬡⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

have been paid to Mrs. J. C. Musgrove by A. R. Dearborn.

(87) Same as to royalties from the Cordova Coal & Coke Company.

James F. Matthews, of Anniston, and R. W. Stoutz, of Muskogee, Okl., for appellants. The register's report is without weight in determining the essential equities. 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764. See, also, State ex rel. McKleroy v. Benners, 185 Ala. 350, 64 South. 308; Philips' Appeal, 68 Pa. 130; 47 Ill. 353; 59 Ala. 188; 127 Mass. 171; 123 Ala. 682, 27 South. 322. A report on one issue is not conclusive on other issues, and the register's view of documentary evidence is not binding. 71 Ala. 81; 88 Fed. 153, 31 C. C. A. 427. The register's finding based on an erroneous legal theory, is without weight. 70 Ala. 63; 34 Cyc. 326; 129 Ala. 201, 30 South. 560. This is also true of a report based on illegal or irrelevant evidence. 70 Ala. 63; 152 Ala. 342, 44 South. 635; 126 N. C. 11, 35 S. E. 128, 48 L. R. A. 751; 153 Ala. 437, 44 South. 958. An executor or administrator is accountable for legal interest, or for any profit made, where he uses funds of the estate for his own benefit. Section 210, Code 1896; 30 Cyc. 427; 23 Ala. 837; 187 Ala. 218, 65 South. 398; 53 Ala. 136; 52 Ala. 167; 25 Ala. 625; 64 N. Y. 471; 92 Ala. 522, 9 South. 182; 55 Wis. 129, 12 N. W. 384. The declarations of J. C. Musgrove should be received with extreme caution. 157 Ala. 91, 47 South. 226, and cases there cited; 16 Cyc. 733, 758, and 761. As to dealings between partners we cite the following: 30 Cyc. 454; 187 Ala. 218, 65 South. 398; 106 Ala. 240, 17 South. 389; 81 Ala. 530, 1 South. 217; 75 Ala. 566. The assignment of the Little Warrior lease for J. C. Musgrove's interest in the Southern Coal Company was void for want of form of corporate action. 3 Clark & Marshall, Corporations, 1905; section 1152, Code 1896; 10 Cyc. 320, 760, and 774; 126 Ala. 449, 28 South. 531, 61 L. R. A. 621.

Ernest Lacy, A. F. Fite, and W. C. Davis, all of Jasper, for appellee. The register properly commenced stating accounts as of June 4, 1902. Parsons on Partnership, 502–506. The title to corporate property rests in the legal entity. 10 Cyc. 373; Nelson v. Owen, 113 Ala. 379, 21 South. 75. The shares of Southern Coal Company's stock issued to L. B. Musgrove were issued with the knowledge and consent of J. C. Musgrove, just as the 48 shares were issued to the latter with the former's knowledge and consent. 216 Pa. 397, 65 Atl. 804; 72 Ala. 437; Parsons on Partnership, 394 and 396; 30 Cyc. 426; 55 Cal. 28. Evidence of declarations against interest have evidential value as showing that the party making them had no interest. 83 Ala. 536, 3 South. 321;

124 Ala. 306, 27 South. 242; 193 Ala. 627, 69 South. 88; 104 Ala. 192, 15 South. 935; 29 Ala. 457; 16 Cyc. 990. Counsel discussed the assignments of error, but without citation of authorities.

SAYRE, J. Appellants, the widow and daughter of J. C. Musgrove, deceased, filed this bill for an accounting against appellee, L. B. Musgrove. In the early '80's the Musgroves, brothers, began business together in a partnership which seems never to have been limited or defined, except as limitation or definition may be inferred from the nature of the enterprises in which they engaged from time to time. Chiefly, however, they engaged in the purchase and sale of mineral lands, in the promotion and organization of land and mining companies, in the operation of a miners' commissary at Corona, and in a general mercantile business at Jasper. In 1893 J. C. Musgrove went to reside in Birmingham, where for four years he was United States marshal for the Northern district of Alabama, and it may be that during that time and thereafter he gave not so much attention to the affairs of the partnership. In July, 1901, as the result of disease from which, no doubt, he had long suffered, he became violently insane, and on June 4, 1902, he was judicially declared to be non compos, he was committed to the hospital for the insane, and appellee was appointed guardian of his estate. In July, 1904, he died, and thereafter appellee was appointed administrator of his estate. This bill, filed in 1907, sought to have appellee's administration of the estate of his brother removed into the chancery court and a settlement there of the partnership, guardianship, and administration. From the decree confirming in the main the register's report of the reference held by him under the direction of the court this appeal has been taken.

For aught appearing the partnership kept no books prior to 1893; the books kept after that time, and upon the meaning of which much of the contention for appellants is based, meagerly and confusedly reflect the business of the partnership. Numerous transcripts from the books, the testimony of the bookkeeper and of the expert accountant who examined them at the instance of appellee, the arguments of counsel and an agreement into which they entered at one point, all concur in showing a most unusual set of books. This appears to have been due, not to any incapacity or neglect on the part of the bookkeepers, but to the character of the information given to them from which to make their entries. They say—or one of them who testifies says—that he picked up such information as he could from any source, and that often entries were made without any definite knowledge of the transaction involved. Many transactions never appeared upon

the books, and it seems that the partners were indifferent whether the books showed an account as between themselves. The idea seems to have been to keep some sort of an account as between the firm and those with whom it had transactions, but even this was so done that no safe inferences can be drawn in respect to some of the transactions in which the firm engaged, and substantially this is conceded by appellants—affirmed, indeed—when they come to the argument of their claim of an interest in certain 100 shares of Jasper Land Company stock acquired by appellee from Ford & Musgrove, to which we shall refer again.

[1] There must have been some weakening of J. C. Musgrove's faculties prior to the violent onset of July, 1901; but it cannot be affirmed, we think, that for any considerable time prior to that onset he was mentally incapacitated for business. The proof is that his associates consulted him about business matters until shortly before that time, and that he attended meetings of the constituent bodies of the corporations in which he was interested. Later on we shall refer to some other of the testimony on this point. In their original bill appellants seem to have proceeded upon the theory that the firm of Musgrove Bros. had been dissolved by the insanity of J. C. Musgrove; but at the hearing below, and now, it was and is contended that in disposing of a number of items, for which appellee claimed and was allowed, credit, the partnership should be treated as continuing down to his death. It is asserted, therefore, that during the period between J. C. Musgrove's adjudicated insanity and his death appellee had no right to engage on his own exclusive account in any enterprise or business of like character with those in which the firm had engaged, and that for every such enterprise or business venture he must account to the representatives of his deceased copartner. Generally, a partner who, without the consent of his copartners and in competition with the business of the partnership, conducts a separate business, must turn his profits into the partnership's coffers. 1 Rowley, Mod. Law of Part. § 396, where the cases are cited. In Latta v. Kilbourn, 150 U. S. 524, 14 Sup. Ct. 201, 37 L. Ed. 1169, it is said that—

"The general principles * * * admit of no question—it being well settled that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; * * * that he cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity, without being accountable to his copartners for any profit that may accrue to him therefrom."

[2] This is the equivalent of that uberrima fides which our law exacts of partners in re-

spect of the partnership business. Dikis v. Likis, 187 Ala. 218, 65 South. 398. But where there are no covenants—and there were none in this case—one may engage in as many outside businesses as· he pleases, provided he does not deprive the partnership of a portion of the skill, industry, or capital which he ought to devote to it according to the intention of the partners, to be inferred. Caldwell v. Leiber, 7 Paige (N. Y.) 483; 1 Rowley, §. 348. It may. now be said generally that what appellee did in the way of organizing or acquiring stock in corporations during this period bore no signs of clandestinity, and it may be seriously doubted that such engagements could in fact or in law be held to compete with the business carried on by the partnership. And this seems to have been the judgment of the partners, prior to the disability of J. C. Musgrove, for it is certain that each of them conducted business enterprises of sundry sorts, each for himself alone, and without any notion that they would be of common concern.

[3] But, aside from this, our judgment is that. the adjudicated insanity of J. C. Musgrove and the appointment of a guardian for his estate, together, if not separately, operated to dissolve the partnership, and that the register correctly treated it as in effect dissolved on that date. Parsons, Part. (4th Ed.) §§ 303, 361, 362. The register did not, indeed, in terms hold that the partnership was dissolved on the date last referred to; but the register, noting appellants' contention that in stating the account he should not charge either of the partners with any amounts received by or for them from the date of J. C. Musgrove's adjudicated insanity to the date of his death—large sums had been paid out during that period for J. C. Musgrove and his family—which contention was influenced, of course, by the well-established custom of the partnership to allow either member of the firm to draw funds at pleasure which at intervals were charged off to the firm's profit and loss account. The register, we say, noting these facts and the appellants' contention aforesaid, acted upon·the conviction that, regardless of when · the partnership was in law dissolved, it was right and equitable for the accounting to begin as of June 4, 1902. Our opinion is that'after·that date appellee's rights and responsibilities in dealing with the partnership property were virtually those of a surviving partner. The two methods lead to the same result.

·Several exceptions to the register's report are based upon his refusal to ·charge appellee with 430 shares of the capital stock of the Southern Coal Company, or with the value thereof. These shares, from the beginning of the life of the corporation down to a time approximately 5 years after appellee sold them and the property of the corporation for his own account, stood on the books

of the company as the property of Musgrove Bros., and upon this circumstance in the main appellants hang their contention that appellee should account for them as partnership property. We will hardly be expected to do more than indicate in a general way the grounds of our conclusion as to this and other differences of a similar kind between the parties.

[4] Entries in the books of a firm, to which the members have had free access, are evidence for and against the partners in settling the partnership accounts, and such entries, to the extent they consist with one another and point to definite conclusions, must, as between the partners and their representatives, be considered as prima facie correct. Desha v. Smith, 20 Ala. 747; Routen v. Bostwick, 59 Ala. 360; 36 Cyc. 743. But, if errors are shown, they should be corrected in stating the account (Routen v. Bostwick, supra); and, if they require explanation, it is proper to have them explained by an expert. (2 Encyc. Ev. 684). Now appellants contend that there is no evidence tending to impeach the entry which shows these shares of stock to have been the property of the partnership. The contention cannot be sustained. Upon the organization of the Southern Coal Company or very shortly thereafter—1896 or 1897—certificates of stock were issued to the Musgroves individually as follows: L. B. Musgrove, 382 shares; J. C. Musgrove, 48 shares. And those shares were muniments of title, evidence of ownership, showing the respective interests of the shareholders in the property of the corporation. Nelson v. Owen, 113 Ala. 379, 21 South. 75. These shares were paid for by the conveyance of property to the corporation. As for the 48 shares which stood in the name of J. C. Musgrove—to dispose of that item first—J. C. Musgrove paid for them by the conveyance of what was known as the Little Warrior lease. This lease was executed to the firm, but it may be uncertain whether it was paid for out of firm assets or with money advanced by appellant Mrs. McKleroy, then the wife of J. C. Musgrove. The books of the partnership show a charge of the purchase money to J. C. Musgrove. However that may have been, it is clear that J. C. Musgrove considered the lease to be a valuable property and consistently treated it as his own. Appellants treat this estimate of deceased as to the value of the property as a delusion of grandeur, an evidence of insanity; but, upon an examination of the evidence, we have been unable to concur in that opinion. It may be doubted whether, in the condition of the properties, the Little Warrior lease was not worth as much as the property of the Southern Coal Company. Subsequently these shares were at the instance of the holder redeemed, so to speak, by the reconveyance of the Little Warrior lease to him. As for the shares issued to appellee, they were paid for by the conveyance of property the title to which was in him.

[5, 6] But appellants insist that the property thus used had been purchased by funds from the partnership till, and this, in part at least —in large part, or even altogether, it may be conceded—is true. It is familiar doctrine that—

"Real estate purchased by partners for the partnership business, and with partnership funds, becomes partnership property; and it is not material in what manner it is bought nor in what name it stands. It will make no difference that the title is in the deceased partner alone, for his heirs will be considered trustee for the survivor. Nor is it necessary that the trust should be expressed, for a court of equity will always supply this want, and treat the ownership as a distinct trust, if only the trust exist and is capable of proof and the land be in fact and substance partnership property. This doctrine rests, as has been said, on the broad foundation of a resulting trust. Parsons on Partnership, 363–365; Pugh's Heirs v. Currie, 5 Ala. 446; Owens v. Collins, 23 Ala. 837."

And appellants quote from a New York decision as follows:

"The manner in which the accounts are kept, whether the purchase money was severally charged to the members of the firm, or whether the accounts treat it the same as other firm property, as to purchase money, income, expenses, etc., are controlling circumstances in determining such intention, and from these circumstances an agreement may be inferred." Fairchild v. Fairchild, 64 N. Y. 471.

[7, 8] Still, as the New York court held, even though property has been paid for with partnership funds, its equitable ownership is a question of intention—a question of fact, it is universally held, to be determined upon consideration of the conduct of the partners or by their agreements either express or implied. 30 Cyc. 432. And prima facie the condition of land is precisely that which is indicated by the muniment of title. Hatchett v. Blanton, 72 Ala. 423–437. We have referred in a very general way to the character of the books kept for the partnership business. These books and the evidence aliunde show an indiscriminate posting of items of partnership account and of individual transactions in which the partnership had no interest. The evidence shows that these brothers carried on their business thus loosely among themselves and with utmost confidence in each other, and we have referred to the custom of the partners to balance off funds drawn from the partnership by either of them. At several places in their briefs appellants have referred to this custom in terms indicating their recognition of it as a proved fact.

[9] The Southern Coal Company's account was so treated. But this was done in 1909, by direction of appellee, it may be conceded, and of course is competent to prove nothing

for appellee. Appellants refer to this dealing with the account as evidence of fraud, as an effort to drag a red herring across the trail of appellee's alleged fraudulent scheme to despoil his brother's estate. We hardly so consider it. It may be said generally at this point that numerous entries of this character appeared on the books when in use before the register. Some of them were made in 1903 by the accountant Hill, who on appellee's request undertook to close up or balance the partnership books. With that purpose in view he made numerous entries relating to the firm's past transactions. Where the previous state of the books failed him, he got information and suggestion from the bookkeeper, who was still in the employment of appellee. The clear inference is that he had no instructions from appellee, except to close up or balance the books, and that appellee made no suggestions nor furnished any information. In 1909 appellee's bookkeeper, Preston, went over the books in the same way. It may be conceded that some of the entries then made were made after consultation with appellee. But at that time, 2 years after the filing of the original bill in this cause, it is proper to observe, the Southern Coal Company stock, now come to be one of the chief items of controversy between the parties, had not been claimed by appellants as partnership assets, and, though this item was at that time charged to profit and loss as of 1902, the books, as well as we are able to read them, show that the change was made in 1909, and could have served no purpose of concealment. Nor does it appear to us that the sale of the Southern Coal Company to the Pennsylvania corporation was otherwise concealed from the appellants' intestate. On the contrary the evidence goes strongly to show, and is uncontradicted, that intestate was fully apprised of the negotiation that preceded the sale, and expressed the hope that his brother, appellee, might succeed in his effort to sell. The charge of fraud seems to be predicated of these two alleged circumstances of concealment; but we do not think they justify the charge.

Further, when a resolution of the Southern Coal Company was passed providing for the surrender by each stockholder of one-fourth of his stock, in order that the corporation might make use of it in raising a loan, J. C. Musgrove surrendered his certificate of 48 shares and in lieu thereof accepted a certificate for 36 shares, or rather, to speak more accurately, such a certificate was prepared and appellant wife of intestate must have concurred in and approved of the proposed transaction and of the implication as to the extent of intestate's ownership involved therein, for she witnessed his execution of the papers supposed to be necessary thereto. That negotiation came to naught; the assignment or pledge of stock was never consummated, for the money was never borrowed; but this manner of dealing is significant of the state of the knowledge of intestate and the appellant, his wife, in respect of the division of the Southern Coal Company stock. Practical dealing with the tangible properties tend to the same conclusion. Appellee managed the Southern Coal Company property; J. C. Musgrove managed the Little Warrior property, each claiming exclusive ownership. As to the Little Warrior property, this management continued until J. C. Musgrove lost his mind; as to the Southern Coal Company property, it continued until the sale to the Pennsylvania corporation in 1901, only a short time before J. C. Musgrove became an incompetent, it is true, but at a time, nevertheless, when, as we think, and as the register found, he was still in possession of his reasonable faculties, and 3 or 4 years after he had taken a reconveyance of the Little Warrior property in exchange for his 48 shares of stock in the Southern Coal Company.

[10] A number of witnesses, with some of whom J. C. Musgrove was interested in various business enterprises, all of whom are evidently men of good intelligence, and all of them apparently men of probity and free from bias, testify to declarations made by J. C. Musgrove from time to time, both before and after the sale of the Southern Coal Company to the Pennsylvania corporation, going in a most unequivocal way to show that he had disposed of his interest—all his interest—in the Southern Coal Company. During the same time he referred to the Southern Coal Company as the property of appellee. All these declarations are to be considered. Barfield v. Evans, 187 Ala. 579, 65 South. 928.

[11] Appellants further say that the reconveyance of the Little Warrior mine, or lease, was never in fact consummated, because, they say, the minutes of the Little Warrior Company show no authorization by the board of directors, that no conveyance was delivered, and, in any event, the contract for reconveyance on the consideration alleged by appellee was ultra vires and void, since a corporation may not purchase its own stock. The evidence sufficiently refutes these objections of fact. No minute record is produced, and it may be conceded that no such record was ever made; but the transaction was in fact authorized, and, whether so or not, it hardly can lie in the mouth of appellants, having accepted and retained the consideration which moved to their predecessor in title, now, nearly 15 years after the event, and long after the sale to the Pennsylvania corporation—appellants' claim of this stock was first propounded in the amended bill filed in 1911—to complain of an executed transaction under which the parties acquired equitable rights, whether consummated according to the forms of law or not. Even creditors

would not be heard to complain after so long a time. The evidence tends to show that a deed of·reconveyance was executed and delivered, and all stockholders consenting, as was the undisputed fact, and no question of public policy or statutory mandate intervening, appellants would not have been heard to complain at any time. Jordan v. Collins, 107 Ala. 572, 18 South. 137; First National Bank v. Winchester, 119 Ala. 168, 24 South. 351, 72 Am. St. Rep. 904; Long v. Georgia Pac. R. R. Co., 91 Ala. 519, 8 South. 706, 24 Am. St. Rep. 931; Touart v. Jett Contracting Co., 169 Ala. 638, 53 South.·751; Hall v. Henderson, 126 Ala. 449, 28 South. 531, 61 L. R. A. 621, 85 Am. St. Rep. 53.

[12, 13] Upon the whole evidence, much too voluminous for anything like a detailed statement, it seems reasonably clear that J. C. Musgrove had full knowledge as to the division of the stock of the Southern Coal Company, as to appellee's claim with reference to the ownership thereof, as to appellee's management and sale of the property as his own after the reconveyance of the Little Warrior property, and that these claims were accepted as based upon right and justice, and must have been the result of dealings among the partners with which they were satisfied, and of which, therefore, no one else will be heard to complain. These considerations, in the absence of fraud or concealment, are very persuasive that the equitable rights of the partners were as the register found them to be. Desha v. Smith, supra. At any rate, there was evidence, much of it delivered ore tenus before the register, to sustain his findings as to these items, and his report, in these circumstances, stands on the same footing as the verdict of a jury, and in its favor all reasonable presumptions must be indulged. Pollard v. Mortgage Co., 139 Ala. 183, 35 South. 767. We are by no means convinced that the register erred, and his findings as to these items must be affirmed.

Appellants assert in the next place that the trial court erred in overruling their claim of an interest in 4,137 shares of stock in the Jasper Land Company. We have just above stated our judgment as to appellants' proposition that the Southern Coal Company was the property of the partnership at the time of the sale. But that transaction involved other properties, and resulted, inter alia, in appellee's acquisition of the Jasper Land Company stock, and appellants contend that properties belonging to the partnership, other than the Southern Coal Company stock, were used, and for it, therefore, appellee should be held to account as for partnership property. Here, again, we can hardly do more than state our conclusions as to the various contentions involved.

Appellee acquired this stock from a New York syndicate shortly before the partnership between himself and his brother was dissolved in the manner hereinbefore stated, the syndicate having acquired in the spring of 1901, 4,000 of these shares from an English company chartered as the Jasper Town & Lands, Limited, and 137 shares from E. K. Campbell and H. B. Gray. That came about in this way: In 1899 and 1900 the Southern Coal Company, the Corona Coal & Coke Company, and the Virginia & Alabama Coal Company, all Alabama companies, were selling their coals in New Orleans through a common agency in competition with the Pennsylvania corporation, to which we have heretofore referred as the purchaser of the Southern Coal Company and its properties. The purchase of the other companies was by the purchaser made a condition of the purchase of the Southern Coal Company. The Pennsylvania company opened negotiations for the purchase of the Alabama companies. The Corona Coal & Coke Company was indebted to the Jasper Land Company, and both these companies were in the hands of receivers. The Jasper Town & Lands owned all the stock of the Corona Company and 4,000 shares of the stock of the Jasper Land Company. It was necessary, therefore, to deal with the English company. Appellee went to John Greenough, in New York, who had lived in London and knew the shareholders of the English company, and suggested to him the formation of a syndicate to purchase the English company. The expectation, based upon inquiry and negotiation, was that by acquiring all the stock of the English company, which could be done at an estimated cost of $330,000 and payment of the debts of the Corona Company, involving $60,000 more (not including an indebtedness to the Jasper Land Company), the syndicate would be able to sell the Corona Company to the Pennsylvania corporation for $400,000 and also acquire the 4,000 shares of Jasper Land stock and other assets belonging to the Jasper Town & Lands.

Appellants contend that this transaction was from the beginning intended for the benefit of Musgrove Bros., or that appellee was operating with property of the partnership, and that the whole profit of the syndicate was to be the difference between the sum it was to pay for the stock of the English company and the sum for which it was to sell the Corona Company. But we do not so find. Unexpected claims against the Corona Company turned up unexpected defects in its land titles developed, and the syndicate, as a result of the transaction, stood to lose fifty-odd thousand dollars. Now appellee, to secure the syndicate against loss, had assigned to it his contract for the sale of the Southern Coal Company and the Corona Coal & Coke Company to the Pennsylvania corporation, and so, on March 27, 1902, appellee, contrary to what had been the anticipation of the parties to the transaction, took over the

stock which had been acquired by the syndicate, made good its losses, and paid it besides $15,000 as compensation for its operations. This he was able to do by reason of his ownership of the Southern Coal Company stock and his contract with the Pennsylvania corporation, and in this way he acquired the 4,000 shares of the Jasper Land Company stock which the English company had owned and as well 137 shares which the syndicate had bought from Campbell and Gray.

In October, 1899, about 15 months before appellee entered into his contract for the sale of the Southern and the Corona Companies, of both which he was president, to the Pennsylvania corporation, appellee, J. C. Musgrove and Musgrove Bros., entered into an agreement, which, however, was never executed, for the reason, as appellants say in their brief, "that litigation ensued over it, because it left out of the benefits the stockholders of Jasper Town & Lands whose stock was said to have been forfeited." To this agreement Jasper Town & Lands, Jasper Land Company, and Corona Coal & Coke Company were also parties, and it stipulated for a settlement of all claims, obligations, differences, and pending litigations between the parties, and the argument for appellants is that, since J. C. Musgrove and Musgrove Bros. were to become the beneficiaries in part of this agreement, because they were interested in the subject-matter, they had the same interest 15 months later; no intervening change having been shown. That first tentative contract contemplated a sale of the Corona Company to the Sloss-Sheffield Company, and did involve shares owned by Musgrove Bros. in the Jasper Land Company; but the firm owned numerous other shares of this stock, with which it is credited in the register's report, and we are unable to find that the October contract affected or purported to affect the shares of stock here in question.

[14, 15] Appellants have laid much stress on some entries in the books kept by appellee and by the New York syndicate tending to show that the purchase of the Jasper Land Company stock was for account of appellee from the outset, that there was an effort to conceal this fact, and the inference is drawn that there was at the time of the transaction, and subsequently at the reference, an effort on the part of appellee to take advantage of his brother's infirmity, and take the benefit of a transaction that in equity and good conscience should be credited to the partnership. Our judgment is that appellee had a right at any time to acquire for himself the shares of stock in controversy, provided, of course, he used his own means to that end; and while an effort at concealment would weigh much in the consideration of other circumstances, we think the record hardly warrants a finding that there was concealment or other fraud. At one place on the ledger kept by H. W. Poor & Co., members of, and bankers for, the syndicate, the account covering the purchase of the Jasper Town & Lands stock was, when put in evidence, headed "L. B. Musgrove a/c Purchase Jasper Town & Lands Co.," and this, as one of the witnesses testified, would indicate that the stock passed through the office for the account of appellee. This account was carried forward to other pages under the heading "H. W. Poor & Co., Jasper Town & Lands Co." In this account the stock is debited with items of interest; but, as the syndicate borrowed money with which to make the purchase, we are unable to attach special significance to these items. This account was transferred in substance to the books kept by appellee, and appellee's theory is that the items had no proper place on his books, and were probably put there by way of a copy of the statement of cost rendered by the syndicate to him when he relieved them of the stock by paying them what it cost and a compensation of $15,000, and that then or afterwards appellee's name was placed above the first page of the Jasper Town & Lands account on the books of the syndicate. However all this may have been—and we do not attach the same importance to it that appellants do—it is incredible that members of the syndicate went into a scheme to defraud J. C. Musgrove, as appellants argue they did, thus involving themselves in a liability of a third of a million dollars. If their testimony is to be believed—and they testify in substantial accord with appellee, though called as witnesses by appellants—the stock was bought for themselves, not appellee, and appellee, whose interest at first was to sell the Southern Coal Company, afterwards purchased the stock here in controversy upon the occasion for the reason, and in the manner above stated.

[16] It is contended on behalf of appellants that a payment of $34,000, which appellee made on his purchase of the Jasper Land Company stock, came out of the funds of the partnership. This contention rests in part upon the proposition that the partnership owned the Southern Coal Company; a part of the money used in making the payment having come from that company. That has been disposed of. In other part the contention rests upon the fact that in making the payment appellee overdrew his account with the Jasper Trust Company, which company, according to appellants' brief, was "just as much J. C. Musgrove's as defendant's [appellee's] at that time." It is not made to appear that the trust company lost anything by the operation, nor that, as matter of law, in the event of a loss, appellants could have charged it against appellee. We find no reason or authority for such a charge. Still another part of the fund from which this payment was made was borrowed from a bank

on a pledge of stock of the Gulf Coal & Coke Company owned by the firm. Appellee deposes that he pledged, or intended to pledge, only his half of the stock standing in the firm name—his own half, as he puts it. As matter of fact he pledged somewhat more than one-half of the stock. Without assuming to approve this partition of the stock, or the use to which it was put, it will suffice, we think, to say that not only did the firm not suffer any loss by the transaction, for appellee's brief alleges that afterwards the property of the Gulf Company was sold, a dividend declared on the stock, of which a proportionate part was received by appellants, or accounted for by appellee; this is not denied by appellants, nor are we cited to evidence in the record which would support a denial. We are therefore bound to act upon the assumption that the trial court committed no error in confirming the register's report and its necessary implication as to this point; but that appellee's mere attempt to ignore the trust and deal with the stock as his own would not, on the strictest theory of liability, charge appellee with more than the value of the use (Perry on Trusts [5th Ed.] § 843; Hoile v. Bailey, 58 Wis. 434, 457, 17 N. W. 322), and the record furnishes no means of ascertaining that.

Negotiation between appellee and the New York syndicate, by which the latter was to be relieved of the burden put upon it by its purchase of the Jasper Town & Lands stock, began in September, 1901; it having then appeared that the syndicate was out of pocket in the sum stated above, though, as we have said, the sale to appellee was not consummated until March, 1902. In October and November, 1901, the syndicate made further purchases of the English stock at an aggregate cost of about $4,500, and appellants, alleging that the English company had been liquidated in May, 1901, point to the fact of these subsequent purchases of stock, then worthless, they say, as going to show that in making them the syndicate was merely continuing to do what it was doing before; that is, buying all the time for account of appellee. While we have thus stated the contention of appellants on this point with some favor to them, we think the statement will suffice to show that the circumstance in question has little or no probative force. Whether Jasper Town & Lands had been already liquidated or not—and that is a matter of doubt—no reason occurs to us why appellee, having determined to buy 4,137 shares of the stock, should not thereafter forestall possible trouble, whether immediately threatened or not, by procuring also the purchase of these outstanding shares.

Appellants comment upon the fact that, it being necessary to bring the property of the Corona Company to the Pennsylvania corporation with a clear title, large claims of Musgrove Bros. against the Corona Company were surrendered by appellee without payment, and in this way, appellants assert, firm assets were contributed by appellee to the sale of the properties of the Southern Coal and the Corona Companies, and, in effect, to the purchase of the Jasper Land Company stock. These items, as constituting parts of the considerations moving from appellee in the stated transactions, were not urged in connection with appellants' claim of the Southern Coal Company stock, though, they bear as appropriately and as directly upon the question of the equitable ownership of that stock. This is true, also, of other items to which appellants refer as evidence of their contention with respect to the Jasper Land Company stock. Nevertheless, the evidence concerning these items, as bearing upon the transactions by which appellee sold the Southern Company and acquired the large block of the Jasper Land Company stock, has here had due consideration in relation to both transactions, and we are unable to say that the register and the court below were in error as to their disposition of the Jasper Land Company stock.

The record and the briefs on this point are far too voluminous to admit of close analytical statement within the limits of a judicial opinion. In respect of the items immediately in question it must suffice to say, as to the item of $216,000—for which amount the Corona Company was indebted by judgment to the Jasper Land Company, which judgment had been filed in the chancery court of Jefferson county, where a receivership of the Corona Company was being administered, as a claim against that company—that in April, 1901, J. C. Musgrove being present, as the minutes show, and of disposing mind and memory as the testimony of his personal physician and other intimates shows, the stockholders of the land company authorized and instructed a "settlement· and compromise" of this claim, that shortly afterwards the directors authorized a release upon the assumption of said claim by the Jasper Town & Lands, whereupon the land company, by and through appellee, its official representative, filed its "relinquishment" of all claims against the Corona Company, outstanding stock, including that held in the name of Musgrove Bros., having been liquidated by the payment of what is referred to as a "dividend," but which was in fact, as we understand, accepted in satisfaction of their interests in the corporation. Appellants denounce the dividend as a "fake," and the whole scheme as a fraud. But it seems highly probable to us that J. C. Musgrove knew and understood the transaction throughout, nor does it appear, in any event, that he or the firm suffered any injury by the method adopted for the discharge· of this debt.

Item of $58,000: Musgrove Bros. had filed

a claim for this amount in the receivership proceedings against the Corona Company. The receivers disputed the entire account, and upon analysis it appears that only $6,000 —we speak in round numbers—was meritorious, the rest consisting of claims for interest and damages which, attorneys for the Musgroves advised, could not be maintained; and the evidence shows that this meritorious claim was by J. C. Musgrove assigned to H. B. Gray, one of the receivers, and by him collected for his own use and benefit.

Item of $110,000: Musgrove Bros. had a claim for this amount in litigation against Jasper Town & Lands, Limited. Appellants make no serious effort to show a loss by the relinquishment of this claim, though commenting right severely upon the purpose (according to appellee) for which the suit was brought and afterwards dismissed. The Musgroves were advised by their attorneys that this claim could not be maintained, and appear to have acquiesced in that conclusion. In these circumstances the court below was justified in holding, as it must have held, that its relinquishment was no evidence of wrong or fraud.

Other items in this list need no elaboration. We find that these items were either paid and accounted for to the firm, were claims which in fact belonged to appellee, were without substantial support in the evidence, or have been in effect disposed of by what has been heretofore said.

[17, 18] Appellants claim that they should have been credited with a one-half interest in 125 shares of Jasper Land Company stock, in addition to 462 shares so credited by the register, and other than the 4,137 purchased by appellee from Jasper Town & Lands. Of these shares 100 had been purchased, in 1892, by Ford & Musgrove, a firm of which J. C. Musgrove was a partner, at execution sale against one Parrish. Appellee's testimony as to how he acquired this stock from his brother was objected to, was incompetent, and cannot be considered. But, considering the other evidence on the same subject, we are not able to say that the register erred. It may be inferred that Musgrove Bros. furnished the money for which Ford parted with his half interest—that is, that money of the firm was used by appellee in that way. These shares were, at the time of that purchase, put upon the books as the property of the firm; but about that time, also, a transfer to appellee was signed by J. C. Musgrove, acting for Ford & Musgrove. Appellants account for this on the ground of a "technical necessity" that J. C. Musgrove must have transferred to another than himself to get the property out of Ford & Musgrove; but there was no technical nor other necessity for this transfer, unless it expressed the precise intent of the parties to it, and from this and the further fact that a new certificate

was issued to appellee, who thereafter, consistently, it appears, treated and voted these shares of stock as his individual property, this being done with the knowledge of his brother, as we must infer—from these facts, the register was authorized to find that the stock stood in the name of the true owner.

[19] Appellants concede in their brief that, from their viewpoint, the 15 shares of stock which appellee got from Coleman and wife present a "puzzling situation." They also concede that Coleman and wife must have owned these shares, that they transferred them to Preston and Preston to appellee. Their objection to the register's report as to them seems to rest upon the proposition that appellee has failed to show that he paid value for the stock, or, if he paid anything, whence the money came. We think it requires no argument to sustain the proposition that, in circumstances shown, the prima facie case made by appellee's certificate of stock should suffice to relieve him of the proposed charge.

[20] Ten shares of the Jasper Land Company stock, known as the Long stock, were issued in 1890 to the firm of Musgrove Bros. In 1896 a new certificate was issued to John B. Long. The evidence shows that this stock was given to Long for the benefit of his children, who were nephew and niece of the Musgroves. Appellants would charge appellee with one-half of these shares, on the theory that the gift was never completed, and, in any event, that appellee had no authority thus to dispose of the firm property. Here, again, appellee's evidence must be excluded, and on the basis thus constituted it would not appear directly and affirmatively that J. C. Musgrove had any part in the gift. But it is not true, as appellants state, that "all evidence that existed during his life repelled the idea of a gift." The two branches of the contention stated above may be answered together. Long held the certificate until he died, in 1904, after which, in 1908, a new certificate was issued to appellee, who testified that he took the stock in this way to prevent his nephew pledging it to secure a loan, and that he still held it for his sister's children. The legal title and real ownership were originally in the partnership (Fields v. Brice, 108 Ala. 632, 18 South. 742); but there is the certificate, and it is difficult to imagine that J. C. Musgrove did not within a reasonable time become apprised of the gift to Long; nor can it help appellants that one purpose— it may be the leading or only purpose—of the gift was to qualify Long as a "dummy" director. Creditors are not complaining, and the deceased must have known the fact that his corporation needed "dummy" directors. In these circumstances and after so long an acquiescence by J. C. Musgrove it should be presumed, we think, in favor of his copartner, that J. C. Musgrove authorized the gift in advance, or, being afterwards informed of

it, ratified the same—the record showing nothing to the contrary—and it seems entirely clear on the facts stated that there was delivery of the certificate of stock.

Appellants' claim that appellee should have been charged with 22 shares, known as the Hayes stock, purchased by appellee from Hayes 2 or 3 years after the death of J. C. Musgrove, rests entirely upon the assertion that in paying for them appellee drew on a fund in which his own had been commingled with the funds belonging to J. C. Musgrove or the partnership. We find no evidence that payment was so made.

The claim of 49 shares, bought by appellee from Johnston and Chamberlain, rested upon the ground that these shares were paid for by a draft on the Jasper Trust Company, was answered in effect when we considered the payment to Poor & Co. shown by appellee's check for $34,000, ante.

Appellants assign for error the action of the chancellor in overruling an exception to the register's refusal to charge appellee with a half interest in a large block of stock, 2,951 shares, of the Gayosa Coal Company stock which appellee took in his own name. This corporation was formed only a few days before the death of J. C. Musgrove, more than 2 years after the judicial declaration of his insanity and the appointment of a guardian for his estate, and nearly 3 years after he actually became insane; appellee subscribing to one share of the stock. However, it is to be conceded that from the beginning 480 other shares, issued to Bruce and Merrell, were really subscribed for appellee. Prior to 1912 appellee had increased his ownership to 2,951 out of a total of 5,000 shares, and in that year, 5 years after the filing of the original bill in this cause, the company holdings were sold by appellee, on behalf of himself and other stockholders, for something like $1,250,000. Appellants are at some pains to demonstrate that this stock was "watered," but we are unable to see that that fact has any relation whatever to any material issue in this cause. Further, appellants say that these must be held for partnership transactions. We have heretofore stated our opinion that the partnership in this case should be treated as in effect dissolved prior to the organization of this corporation, and this point needs no further statement. Further, appellants say that appellee's stock was acquired by the conveyance to the corporation of property which belonged to the partnership. Appellee denies this, and we find no evidence in the record which would justify us in overruling the conclusion of the judge and register in the trial court.

Land purchased by appellee from Dr. Miller went in part to pay for this stock. Appellants hold that appellee should account for these shares—more consistently with equi-

table doctrine this contention might have taken the form of an assertion that appellee should be held to account to the extent of the funds thus used—for the reason that, in substance, he used funds of the partnership in large part in paying for it. This conclusion is worked out as a result of the fact that he overdrew his account with the Jasper Trust Company, and borrowed the money from the Jasper Land Company with which to reimburse the trust company. This proposition, in substance, has been considered in connection with another assignment of error. But the form of the insistence here is that appellee used firm funds in substance and effect, when he thus got money from the two corporations which he dominated by his control of stock belonging to the firm. To quote the brief:

"By using the funds of those institutions ad libitum he in effect used funds belonging to the firm."

[21, 22] The trust doctrine, here invoked, must rest upon the original overdraft—no intentional fraud being proved—for a trust in such case can result only from the original transaction, and the application of trust funds to the payment of the purchase money must be coeval with the conveyance; a subsequent use of trust funds in payment of the trustee's obligation is not sufficient to create a trust. Coles v. Allen, 64 Ala. 98. And the overdraft having been repaid, there is really nothing left but a question of profit realized, and, assuming the possibility of estimating the fact and amount of such profit from the evidence, none can be allowed, for the reason that the funds of the trust company were not the funds of any one or two stockholders any more than of others. The fact that the trust company was a separate legal entity cannot be ignored, without ignoring familiar principle and introducing a cause of utter confusion, which would be subversive of rights in corporate property. In another part, the argument as to this item rests upon the proposition that the Southern Coal Company, at the time of its disposal to the Pennsylvania corporation, belonged to Musgrove Bros. We have elsewhere held that this company— so to speak of the great body of stock standing in the name of appellee—belonged to appellee individually. The same reasoning applies to the Cobb land conveyed, in effect, by appellee to the Gayosa Company in payment for stock; to the Bessemer Bank land; to the conveyance of land and personal property of the Bruce Coal Company in the purchase of stock; and to appellee's acquisition of stock from Murray Cannon, L. Walton, 400 shares of stock from the Gayosa Company on April 24, 1905, 1,400 shares acquired by the conveyance of Kentucky lands and land referred to in the briefs as the lands of L. B. and J. C. Musgrove, 1,034 shares acquired

by the Gayosa Company from the Jasper Land Company in 1906, 622 shares in exchange for stock of the Walker County Coal & Mineral Land Company stock in 1906; and 952 treasury stock issued to appellee in 1912, though the issue was authorized in 1906.

[23] Touching the transaction involving the "L. B. & J. C. Musgrove land," noted above, this must be said in the way of further explanation. In part payment appellee conveyed his half interest in the land, and appellants' thesis in respect of that transaction is that, since the land was partnership property and partners do not own such land "as tenants in common in the ordinary sense," such property will be treated in a court of equity as personalty, citing Rovelsky v. Brown, 92 Ala. 522, 9 South. 182, 25 Am. St. Rep. 83, and Hatchett v. Blanton, 72 Ala. 423. If it were necessary to dispose of this interest in the land in order to satisfy the just claims of creditors or partners, or if the question were whether this land, had it not been disposed of, should descend to heirs as real estate or to personal representatives for distribution as personalty, there might be occasion to inquire as to the effect of the doctrine of equitable conversion which appellants have in mind; but the fact is that no such purpose can be served in this cause, for the reason that no such questions are involved, and the land in question stands clothed in all its legal characteristics as the property of the individual members of the firm, or their separate alienees, as tenants in common. Lang's Heirs v. Waring, 25 Ala. 625, 60 Am. Dec. 533; Caldwell v. Parmer's Adm'r, 56 Ala. 405; Allen v. Watts, 98 Ala. 384, 11 South. 646. Of all the transactions involved in the acquisition of Gayosa Coal Company stock appellants complain as "high finance." But our judgment is that the estate of J. C. Musgrove is not interested in these transactions, and therefore that we need not inquire as to this alleged cause of complaint.

In the summer of 1906 the Gayosa Coal Company—dominated, it may be conceded, by appellee, since he owned a majority of all the stock and seems in fact to have controlled the transaction—bought from the Pennsylvania corporation, to which we have heretofore referred, 9,200 shares of the capital stock of the Corona Coal & Iron Company, which had been sold to the Pennsylvania company along with the Southern Coal Company. Payments in addition to the assumption of a large bonded indebtedness which was provided for, were to be made as follows: $61,000 to be paid a month or thereabouts later, $50,000 on July 1, 1907, and $50,000 on July 1, 1908. Appellants contend that (1) the Gayosa Company acquired this stock with money and other property of the firm of Musgrove Bros., which appellee used for that purpose; and (2) that the payment of the first deferred payment was secured by appellee's deposit with the vendors of stock in the Gulf Coke & Coal Company, which was the property of the firm, and appellants maintain in their brief that either of these two different facts furnish sufficient reason for—

"requiring all of said Gayosa Coal Company stock and proceeds, and particularly the purchase of the Corona Coal & Iron Company, to be considered as firm property, and the defendant held liable as trustee."

In view of what has been said heretofore we need not consider further the first branch of the foregoing contention. As for the second, it does appear that appellee secured the payment of the installment of $61,000 by a pledge of his personal note, and, along with some other collateral, Gulf Coal Company stock, the property of the firm of Musgrove Bros. Appellee has testified that he intended to pledge only his individual interest in the Gulf stock and that the pledge was so accepted by the bank from which he borrowed the money for the Gayosa Company. Such, in any case, was the legal effect of the pledge, for the stock stood in the name of the firm, and the bank must have known its ownership. But, aside from that, this pledge was redeemed without loss to the firm or either member thereof, and enough has been said in the discussion of other assignments of error to dispose of this branch of the argument also. But at last appellants come to the proposition that (3) since equity regards the substance of things, and since the Gayosa Company was practically synonymous with L. B. Musgrove because L. B. Musgrove held all except a very small fraction of the stock, to permit him to hide his identity behind this thin disguise would permit him to make any sort of fraudulent disposition of trust property, provided he did so through a corporate alias, and since the Gayosa and Corona Companies were by appellee made over to the Adlers, while appellee alone enjoys the fruits of the transaction, he should be brought to book without the presence of those corporations. So, in substance, appellants state their contention. But, notwithstanding all this, if the facts be correctly stated, the only material thing is that appellee to accomplish his individual purpose, pledged stock in which his ward, or the estate of the decedent he represented—the result will be the same in either case—was interested equally with himself. The pledge was redeemed and has been accounted for, and the question now proposed by appellants, very like one already considered, is whether the property thus acquired shall or may be held as the property of the cestui que trust. This property was not consumed in the purchase of other property, nor was it so mixed with property of the trustee as to become indistinguishable therefrom, and familiar author-

ities dealing with cases in which such things have been done are not applicable. Nor is it seen how appellee can, on the evidence, be held as guardian, administrator, or surviving partner, to account for profits. If profits alone were claimed, and if the fact and amount of total profits were ascertained, then, apart from the incidents attached by the law to a pledge of stock under the circumstances here shown, it would still be true that no means is afforded of apportioning the profits. According to the analogy of authorities cited above (Perry on Trusts, § 843; Hoile v. Bailey, 58 Wis. 434, 17 N. W. 322), appellants might be entitled to the value of the use of the stock pledged as collateral, but that was not shown, and it seems clear enough that appellants' claim to the whole product of the transaction cannot in equity be allowed.

[24] We assent to the following statement of the law to be found, with citation of numerous authorities, in Perrin v. Lepper, 72 Mich. 454, 555, 40 N. W. 859, 905:

"If, however, the trustee has shown an utter disregard for the interest of the beneficiary, and deliberately planned to absorb the trust fund by his fraudulent disposition of it to his use, and attempts to destroy or suppress the evidence of his management of the fund, and the profits he has received therefrom, and so far succeeds in his purpose that no one but himself can trace the fund or its accumulations, and when called upon to account he renders false and fictitious accounts, so defective as to be impossible of proper judicial investigation and adjudication, in such case, if the amount of the fund which he has used can be ascertained, he may be charged therewith, and the largest profits that can lawfully be made thereon by the most sagacious and expert business men in their management of money, even to the allowing of compound interest at the highest lawful rates, and making rests annually or semi-annually, if it shall appear just and equitable to the court, in securing to the cestui que trust the use of his property of which he has been deprived. The law entitles him to all the accumulations of his property while in the trustee's hands, and, under the circumstances stated, when he refuses to account, it will be presumed he has received such accumulation, and that such amount is the beneficiary's loss, and a court of equity may give it to him. Such sum is not awarded for the purposes of punishment or imposing a penalty on the trustee for his maladministration of the trusts. Courts of equity do not impose or enforce penalties, or punish parties for their wrongs in the administration of trusts, but only furnish the adequate means of redress when the law fails so to do. Beyond this they do not go, unless so directed by the lawmaking power."

[25] It is true, also, that every presumption is indulged against a party who has willfully kept incorrect accounts. 9 Encyc. Ev. 569. Upon these propositions throughout the case appellants have relied. But the cause in hand, in our judgment, is far from falling under the controlling influence of the principles relied upon. In the outset we said something of the books. We noted the fact that for quite a number of years the firm seems to have kept no books. For that method of business and for the looseness which characterized the books during the rest of the time in which partnership affairs were being transacted, the deceased must in considerable measure share with appellee what responsibility attaches to this state of the books. The books are imperfect, but they have been pieced out by information from various sources; so far as we are able to judge they afford no evidence of fraud, and they have been submitted without reserve to the examination of an expert for appellants and to the court. Counsel make an effort to show that one ledger of the Gayosa Company "mysteriously" disappeared, and intimate appellee's responsibility for that disappearance; but the evidence tends strongly to show that the ledger in question was turned over to the Adlers when they purchased the stock and property of the corporation, and it is difficult to understand why appellee should have been at pains to bring about the disappearance of that one among the many books which have contributed to the evidence in this cause. If he did so, he was more careless than crafty schemers generally are, for, it seems, evidence of the facts the ledger might have shown was found in the underlying journal, which did not disappear. But we find no evidence that there has been any attempt on the part of appellee to destroy or suppress evidence, nor any that incorrect accounts have been willfully kept. Nor do we believe—and always appellants, responding to the necessities of their case, fall back upon this assertion—that appellee "deliberately" or otherwise planned to absorb any interest of his brother, alive or dead, in any property, by fraudulently disposing of it to his own use, nor that he has been disregardful of the legal rights of appellants. On the contrary, much might be said on information furnished by the record to sustain the proposition that appellee, though careless in some of the details of a large speculative business, was generous as well as just to his brother and his family; but we need not go into that.

[26] It is said in the brief for appellants that appellee "admixed in his own bank account all the funds coming to his hands as surviving partner or in any of the capacities in which he is now held accountable." It is true that there was something of this. Appellee deposited partnership funds to his individual credit, and afterwards drew against them for his individual use; but it does not appear that this contributed in the least to the transactions we have heretofore had under consideration, and for the use of these sums the register has charged appellee with interest down to the date of settlement. This,

in our judgment, sufficiently compensates appellants and satisfies the demands of equity. Collins v. Clements, 199 Ala. 618, 75 South. 165, and cases there cited.

Appellants argue at some length that the register erred in refusing to charge appellee with $1,350,000, the net proceeds realized from the sale of the Gayosa and Corona Companies and the Walker County Coal & Mining Company to the Adlers in 1912. So far as this argument is based upon the alleged wrong of appellee in acquiring the stock of these companies, we have heretofore stated the results of our best consideration. In other parts the argument appears to rest upon alleged wrong to minority stockholders, other than appellants or their principal, and we think we need not incumber the opinion with any further statement as to a matter in which appellants have no interest.

Appellants excepted to that part of the register's report in which he found 1,288 shares of the stock of the Alabama Improvement Company to have been the individual property of J. C. Musgrove, and held appellee to account therefor. These shares stood upon the books in the name of the firm, but on the evidence, including the stock certificate in the name of J. C. Musgrove, the register found as indicated above. Of course, this ruling did not of itself do any hurt to appellants, and the exception to it cannot be sustained; but this stock it seems, was not of great value, and the argument to show error, which is quite elaborate, has in view, we must suppose, a collateral question to which we will advert in the next place. The same consideration applies to an assignment which complains of the register's failure to charge the firm with a solvent account of $697, said to be due from the Alabama Improvement Company to the firm of Musgrove Bros., and for which appellee had accounted. This allegation of error is based upon none other than the theory that this account was due to the firm, whereas in fact it was due to J. C. Musgrove.

[27] In the next place appellants claim that 420 shares of stock of the Elemac Coal Company was held to be the property of appellee, instead of the firm of which he was a member. This stock was acquired in 1887 as a part of a transaction in which the firm disposed of a tract of land. A certificate of stock was issued in the name of appellee, and has so remained until the present time; but when the firm began to keep books, five or six years later, this stock was credited to the firm, and thereafter was listed by the firm on its tax returns. The register's report mentions only in the way of evidence that the certificate was in the name of appellee. That we think would hardly suffice to sustain the report as to this item in the circumstances mentioned. We assume, however, that the register considered all admissible evidence on this point, and among the rest this: On the cross-examination of appellee, after he had testified to the firm's purchase of the Alabama Improvement Company stock, he was required to say whether, "after this controlling interest in the Alabama Improvement Company was acquired by the firm, did they not arrange a deal whereby about 8,500 acres of land previously owned by the company should be sold to the Jasper Town & Lands, Limited"? Appellee answered:

"Yes, after much trading and trafficking about. I did not want to become seller and buyer, too, and then it was that my brother and myself agreed that he would take over the stock and I would take over the Elemac stock."

Appellants objected to so much of this answer as followed the word "Yes." We think appellee could not properly be confined to a "yes" or "no" answer. If he was to be examined by his adversary as to the fact of the "deal" inquired about, he was entitled to state the whole truth, the constituent facts of the "deal." With this evidence in, the register's report was properly allowed to stand undisturbed.

[28] Ten shares of stock of the Gulf Coke & Coal Company, and some small dividends collected thereon, were credited by the register to appellee as his individual property. Appellants reserved an exception. The firm owned over 2,000 shares of this stock, including 10 shares, the ownership of which was evidenced by a certificate issued about the same time as the certificate to the stock in question. The certificate for this last-mentioned stock, the stock in dispute, was issued in the name of appellee. All the rest were issued to the firm. The bookkeeper for the firm, and afterwards for appellee testified that an entry on the firm books indicated that these 10 shares were paid for with firm funds. All shares were credited on the book to the firm. Appellee says in his brief that the entry as to these shares was in the shape of a pencil memorandum; but we have been unable to verify the statement. That condition of the entry might indicate some doubt, and evidently there was a doubt later, as to the ownership of these shares. But, without these indicia, and accepting the bookkeeper's statement as to what the entry indicated—a clearly correct judgment as to the prima facie effect of the entry standing alone—the register's finding should still be sustained. The certificate has significance, peculiar significance, it may be, in view of the fact that all other certificates of this stock, several of them, were issued in the name of the firm. And appellee testified that the 10 shares in question were issued to him in the way of compensation when he, a director of the corporation—his brother was not a director—with other directors advanced money for the payment of

taxes and other purposes, as they did from time to time when necessary. On this evidence we will not say that the register committed error at this point. On the contrary, we think the register was right.

[29] The substance of the thirty-eighth assignment of error is that the trial court erred in overruling appellants' exception to the register's report by which appellants complained that the register should have charged appellee with 546 shares of stock in the Walker County Coal & Mineral Land Company, or—since appellee had accounted for the sale of this stock at a price of $6,825—that said sale be declared to be a transfer for the benefit of appellee, and that said transfer be disaffirmed. In the thirty-ninth assignment appellants insist that appellee should have been held to account for 1,558 other shares of the Walker County Company. These two assignments may be considered together, and a statement of the facts as they appear of record will indicate the correct answer. In 1885 Musgrove Bros. sold and conveyed to the Walker County Company a large tract of land, agreeing to take 546 shares of stock of the company in part payment. A dispute arose whether the firm had title to some of the land and were liable to the company on its warranty, the result being that the firm could not get the stock for which it had bargained. In May, 1904, appellee purchased 1,558 shares of stock which had been pledged by another stockholder to the Howell Cotton Company, so acquiring control of a majority of the stock, and thereupon procured the issue of a certificate for the 546 shares. For the stock purchased from the Howell Cotton Company appellee gave a note signed by himself individually and as surviving partner, and a certificate was issued to "L. B. Musgrove surviving partner of Musgrove Bros." Appellee informed his sister-in-law, then his brother's widow, now the appellant Mrs. McKleroy, of the situation, and suggested that she agree that joint funds be used to pay for the stock. Upon her refusal, he assigned these 1,558 shares of stock to the Jasper Land Company, which paid his note and took the stock. This stock, in 1906, was transferred to the Gayosa Coal Company in exchange for 622 shares of stock in the latter, and the last-named stock was later sold to the Adlers for a profit. Appellee sold the 546 shares to Preston, who kept books for various concerns in which appellee was interested and as well personal books for appellee, and as before stated has accounted for the purchase money. Preston sold to the Jasper Land Company at a profit of about $1 a share. Appellee and Preston testify to facts which would make bona fide transactions of these several transfers or assignments of the Walker County Company stock; but appellants, upon the ground that appellee owned a large majority of the stock of the Jasper Land Company and because of "deliberate concealment," evidence of which they find in the fact that the books kept by appellee to show transactions for firm account, by an entry, dated October 19, 1912, five years after this bill had been filed, showed the sale of this stock but failed to show the name of the purchaser—upon these facts appellants contend that the sale of 546 shares was made by appellee to himself in truth and in fact, and, therefore, that appellants have a right to disaffirm. The sale was at full value, it may be inferred—at least it was considerably in excess of the price per share for which appellee was able to buy the stock held by the Howell Cotton Company, with whom, for aught appearing, appellee had no relations whatever. As surviving partner he had a right to make the sale, if honestly made. Offutt v. Scott, 47 Ala. 104; 30 Cyc. 623.

[30] We have stated the effect of the testimony of appellee and his bookkeeper, Preston, and are unable to see in the circumstances to which appellants have referred sufficient reason for overturning the register's conclusion. Moreover, appellants cannot have a decree of restitution on this record for lack of proper parties, nor, having accounted for the price realized, can appellee be charged with more, for there is no evidence that the stock was at any time worth more. As for the 1,-558 shares, the authority of appellee to acquire them for firm account would have been questioned, and on good legal grounds, had it involved the firm estate in a loss. But apart from that, and assuming for the moment that he acquired title for himself as surviving partner in part, he had a right upon a like condition to dispose of that too. But appellants say that Preston had no money—and Preston himself says he was operating on nerve—and deny Preston's testimony to the effect that appellee was unable at the time to meet the note he had given for the stock, and they see in appellee's change of purpose evidence of the continuing development of a fraudulent design to appropriate to himself the estate left by his brother. Upon due consideration of all the circumstances we are unable to agree with appellants. Appellee had a right to acquire this stock for himself, no money or other value belonging to his brother or the firm contributed to the purchase, and the fact that he invited the appellant, his sister-in-law, two years after the death of his brother and at a time when the stock was still pledged with his vendor to secure the purchase money, to give her assent to his use of firm assets to complete the purchase, there being nothing to indicate lack of good faith in the invitation, would seem sufficiently to establish the good faith of the transaction by which these 1,558 shares of stock passed into the Jasper Land

Company—this, though appellee was more largely interested in that company than was the estate of his deceased partner.

Appellants claim an interest in 261 shares of Jasper Trust Company stock derived from the Jasper Land Company. In 1898, J. C. Musgrove present and concurring, the directors of the Land Company voted these shares, then owned by it, to appellee in part payment of a claim he had against the Land Company for personal services rendered during a number of years. This claim was for services which covered a period somewhat in excess of 10 years, and was fixed and allowed in a sum exceeding $36,000. Appellants suggest at one place that this allowance was part of preparation being then made against a day of anticipated trouble for the corporations involved, and there appears to be much reason in the suggestion. However, appellants say further that it is "very evident that the parties honestly intended that the delivery of the stock should be made under the resolution of 1898." Concurrently with this action of the directors as to the stock, they directed the payment to appellee of the sum of $9,400 as a further credit against his claim for services. An entry on the books of the firm of that date—showing again 'how partnership and individual matters were commingled there—charged the land company with the $36,000 and credited appellee with a like sum. At the same time the sum of $9,400, paid by a check on the trust company and probably consuming the land company's cash balance with the trust company, was credited to Musgrove Bros. It may be—though there is hardly more than a shrewd conjecture to that effect—that appellee was not entitled to these payments; but that is no reason why they should be credited to the firm. The great formality with which this stock was awarded to appellee and J. C. Musgrove's personal participation in the transaction suffice for the conclusion, as matter of law, that the stock was intended for appellee. But the fact is that the stock at that time was in the possession of Greenough in New York, and was not delivered in pursuance of the resolution of 1898, and at a meeting of stockholders held in April, 1901, the minutes of which recite the presence of "L. B. and J. C. Musgrove, 430⅓ shares," the directors—J. C. Musgrove being elected one of them—were authorized and instructed to deliver the said stock to appellee, which was accordingly done. But the land company had subscribed for 349 other shares, in which also appellants claim an interest. All parties are agreed that the trust company, too, was in bad shape and that its stock was much depreciated; but for these 349 shares the land company was indebted on its subscription. The resolution of April, 1901, provided, therefore, that the Land Company would transfer to appellee all the stock owned by it in the Jasper Trust Company "conditioned only on said Musgrove assuming the liability of this company with respect to its subscription to said trust company stock and this company being released from said liability," which was accordingly done. The book entry was then changed. Appellee testified that he had subsequently paid for the 349 shares; there is nothing to the contrary, nor any reason why his testimony should not be accepted.

[31] There are some "mysteries" in the bookkeeping. We referred to this subject in the beginning. But appellants at one point in the second volume of their brief assert that from 1893, when the firm began to keep books, down to the inception of J. C. Musgrove's mental incapacity—which, as we have heretofore stated in effect, cannot be assigned to any point of time much anterior to the date of the sudden onset of insanity—"both members" of the firm "gave equal attention to the business of the concerns which they dominated" except that J. C. Musgrove's attention must have been largely withdrawn from the business of the firm while he served as United States marshal, and in view of the well-established facts, to which also we have referred, the books have not much weight, though it be assumed—contrary to the fact, according to our understanding—that the entries thereon tended to prove something else. This, we think, is enough to dispose of the claim against the 261 shares of stock and as well that against the 349 shares, which latter the appellants treat in a separate part of their brief. In addition, however, appellants claim that these last-named shares of stock were paid for by funds derived by appellee from the sale of Gayosa stock to the Adlers, and that, since the Gayosa property, in part at least, was bought with partnership funds, this stock should be accounted for as property of the partnership. The same contention, last mentioned, is made as to other 113 shares of the trust company stock purchased by appellee from the Jasper Land Company in 1912. We have heretofore stated our consideration of the matter of the Gayosa Company.

Appellants trace their claim to still other shares, which appellee purchased from Cranford in 1904 or 1905, back to rights supposed to have accrued from the sale of the Southern Coal Company. Our statement as to that has been made.

Appellants' claim to additional small blocks of Jasper Trust Company stock, acquired by appellee during the period from 1903 to 1909, rest upon the theory that appellee drew against firm assets to pay for these shares. In view of what has been said, no further statement is necessary.

[32] Not many words need be given to appellants' claim to the Eagle newspaper, and

that the register failed to charge appellee with a fair rental for the second floor of a building owned by the firm in Jasper and for several years occupied by the Eagle. Notwithstanding the Eagle later figured on the books of the firm, as did other items of individual interest only, appellee testified—and was corroborated—that he acquired this newspaper as far back as 1880, and that it was his property. His testimony was competent (Steiner Bros. v. Tranum, 98 Ala. 315, 13 South. 365), and there was nothing to show that he misrepresented the fact. On the contrary, J. C. Musgrove on a number of occasions declared he had no interest in the newspaper business. He probably knew there was no money in it. As for the rent, the register charged appellee with rent, he saw the witnesses, and it is not at all clear that he erred in failing to make the charge greater; this we hold notwithstanding appellee, in 1897, let the newspaper, its paraphernalia, and the room in which printing presses and outfit were then located, for the term of one year, the room being the property of the firm.

Appellants would charge appellee with the sum of $566.91, due from the Jasper Land Company, which they say appellee negligently failed to collect. The charges against the land company are mostly the personal matters of the appellee, as, for example, the item of $36,000 to appellee for services, the item of $9,400 on the same account, to which we have referred, and some others of like character. The bookkeeper shows the nature of the items, he is corroborated by other evidence to which we have referred, and we find no sufficient reason for differing from the conclusion, which must have prevailed in the trial court, that the Jasper Land Company was not indebted to the firm in the sum claimed.

[33] In the account filed by appellee he charged himself with $668.03, being, as he then stated, "the amount charged back by auditor." The register thought that appellee had made a mistake, indicating his reason for so thinking, that this amount had been accounted for elsewhere, and so he relieved appellee of this charge. Appellants do not argue that the register was mistaken, but that this was voluntarily done without any legal challenge by either party, and point to this action, in connection with other rulings upon which they animadvert, as evidence of the register's partizanship and partiality for the appellee. The record does not show why this ruling was made, unless it was that the register supposed he might, ex mero, or perhaps upon a mere verbal offer to correct the mistake, relieve appellee of a double charge for the same item. Appellee's statement of his account was, of course, prima facie evidence of its correctness as against himself; but there was no error in allowing a mistake to be corrected in the register's statement of the account. Craig v. McGehee, 16 Ala. 41.

J. C. Musgrove paid to Susan N. Wallace $1,305 in discharge of a note and mortgage on partnership property securing the same. Appellee had signed the note with deceased. Appellee credited himself with this amount as surviving partner. The register transferred the credit to appellee's account as guardian. Appellants say there is no legal evidence in the record justifying the register's act. Appellee, as a witness, denied that he got the money, and this evidence—omitting his statement that deceased got the money—if competent, would result in the inference that deceased got the money on his personal account. Appellee holds the denial to be competent, and we may cite, as bearing upon the question, Blount v. Blount, 158 Ala. 242, 48 South. 581, 21 L. R. A. (N. S.) 755, 17 Ann. Cas. 392, and Warten v. Black, 195 Ala. 93, 70 South. 758; but it is unnecessary to pass upon this issue as to competency, for the testimony of R. D. Johnston amply supports the conclusion reached by the register. Similar considerations serve to dispose of assignments of error 76, 79, 80, and 82.

Assignment of error 74—we discuss this assignment in the order of appellants' presentation—complains that the register allowed appellee credit for $1,220.40, the amount paid by him in settlement of an overdraft on the Jasper Trust Company by the firm. The register reports that the legal evidence sustained the finding of an overdraft for this amount on June 4, 1902. Appellants do not controvert this finding, but seek to introduce error on the theory that the account should have been stated as of the date of the death of J. C. Musgrove. Referring to the dates in question, we discussed this matter in the outset of this opinion. A like consideration applies to assignments 83 and 84.

It is not made to appear wherein the register erred as alleged in assignment 87.

Appellants complain that the chancellor erred in allowing appellee compensation as administrator, and in taxing appellants (complainants) with one-half of the costs of the cause, claiming generally appellee's mismanagement and spoliation of the estate. It results from our previous consideration of the specific charges of wrong made against appellee that this contention should not be sustained.

[34] Other assignments are general in their nature, alleging error in the register's method of taking the several accounts involved and that the register erred in not ruling specifically on numerous objections to evidence. Such rulings were not necessary. The progress and result of the cause at every stage has been determined on the legal evidence. If the register committed errors in any of these rulings, we must presume the

consequences of such errors were eliminated by the chancellor. At least, that has been the process in this court.

It has been impossible to give detailed consideration and statement to every phase of the numerous questions raised on the record and discussed in the briefs. Perhaps all statement might have been as well omitted; but the foregoing has been written in response to the assumed expectation of counsel, and, being written, has been kept within what limits seemed possible. Throughout the good faith of the register has been under attack. Perhaps this fact has stirred him to unusual diligence in the preparation of his report. At any rate, the report appears to us to have been considered and formulated with an unusual degree of care, and, so far as we are able to judge, with impartial judgment. The result must be affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and GARDNER, JJ., concur.